MAX N. TOBIAS, JR. Judge.
| iThis case arises out of a petition for protection brought pursuant to La. R.S. 46:2131, the Domestic Abuse Assistance Act. The trial court rendered judgment on 3 October 2013, granting a protective , order on behalf of I.D.S.[3] and her two minor children, D.S. and M.S., against D.M.S. From that judgment, D.M.S. appeals.[4] After a thorough review of the record on appeal and finding no abuse of discretion or legal error, we affirm.
FACTUAL.AND PROCEDURAL BACKGROUND
On 6 February 2013, D.S., the then 12-year-old son of the petitioner, I.D.S., and her ex-husband/appellant, D.M.S., presented on his own accord to the school counselors at St. Christopher’s School with complaints that he and his younger |2brother, M.S., were being physically and verbally abused by their father.[5] D.S. recounted several incidences of recent abuse and expressed that he was “tired” of it happening.: D.S. also complained that D.M.S. had made verbal threats to .him about inflicting physical harm upon his mother. That same day, D.S.’s allegations of abuse and verbal threats were corroborated by M.S., then 10 years old, who made similar complaints to the counselors of physical and verbal abuse against himself by D.M.S.[6] Specifically, the boys shared that their father hit them.in the stomach, pulled their hair, called them derogatory names, required them to. fend for themselves when it came to meals, and often threatened them. Both boys expressed their fear of their father. ■- '
After listening to their particular allegations of abuse, the counselors directed the *1131 boys to memorialize their complaints in writing. D.S.’s written statement, dated 6 February 2013, which was introduced into evidence, contained the following:
My dad hit us alot [sic] and yells at us and he is mean. He hurts us for little things. He hits and hurts - us[,] pulls hair[,] hits with fist and hand baek[,] stomach[,] arms mess us up he hurts us. He said he would. [A]bout a month ago he said he would kill her.... He said he hurt us and would teh [sic] us to lie. We were afraid to tell the truth. I don’t want he [sic] to know ... tell [sic] next week. He came to the game and yelled at my coach and was. mean and would not calm down. My dad is getting medical procedure. We do not ever eat food when we are with my dad. He makes us write notes forces us.
M.S.’s written statement, also dated 6 February 2013, states:
He hit us in. like the stomach and kicked us. He kicks us[,] yells[,] he throws his phone[,] hits us with his fist when we get in troble [sic][.] He said he would get a gun | ¡¡or a bat and kill her [their mother] in her house[.] My step mom is aware that he hits us[.] She got hit once[.]
•The boys’ mother, I.D.S., was. summoned to the school and, at the direction of the school counselors, they relayed to her the repeated abuses upon them by their father. Thereafter, a legally mandated report was made to the Louisiana Department of Children and Family Services (“DCFS”) by the school counselors. Two days later, on the morning of 8 February 2013, the boys advised the school counselors of additional abuse having occurred the previous evening while in the care and custody of D.M.S. According to the boys, after failing to retrieve coins stuck in the gear shift of their father’s car in a timely manner, D.M.S. slapped M.S., pulled his hair hard, and slammed his head on the armrest. In an effort to stop the abuse, M.S. scratched his father, at which time his father threatened to “punch him in the face like a man and knock him out” if M.S. ever touched him again. M.S. also complained that, on that same evening, his father shoved him across the. floor. Upon hearing these new allegations, the school counselor initiated a second report of abuse to DCFS. After -the complaints of abuse by the minor children were authenticated by DCFS, DCFS ordered the boys’ mother to seek a temporary restraining order (“TRO”) on behalf of herself and her children against D.M.S.
On 8 February 2013, at the direction of DCFS and pursuant to La.'R.S. 46:2131 et seq., I.D.S. filed a petition for protection from abuse (“the Petition”) on behalf of herself and her minor children, D.S. and M.S., alleging that D.M.S. regularly “slapped, scratched, kicked,” punched, shoved, and threatened each of the boys “when they are in [his] custody,” and that D.M.S. had threatened her life. Additionally, the Petition averred that the most recent incident of abuse [ .precipitating the filing of the Petition occurred on 7 February 2013, when D.M.S. “hit [M.S.] in the head and pulled the children’s hair” when M.S. failed to quickly remove coins from the stick shift of their father’s vehicle. Upon the filing of the Petition, a TRO was issued that' day awarding I.D.S. temporary sole custody of the minor children and enjoining D.M.S. from abusing, harassing, stalking, threatening, et cetera, I.D.S. and the children, and prohibiting D.M.S. from being within 100 yards of them. Following the issuance óf the TRO, the children were returned to the custody of I.D.S., where they have since remained.
Upon gaining custody of the minor children and learning of the alleged repeated abuses upon both of them by their father, I.D.S. took the boys to be evaluated, at Children’s Hospital in New Orleans on 11 *1132 February 2013. At that time, the boys were each examined and interviewed separately by Dr. Neha Mehta, a forensic physician, regarding the alleged abuse. Dr. Mehta is the medical director of Child Abuse Pediatrics at the Audrey Hepburn CARE Center located at Children’s Hospital. The boys, individually, reiterated in detail the events they had previously shared with their mother and school counselors. While no objective physical findings were noted on D.S.’s examination, M.S.’s evaluation indicated “slight residual scalp swelling with reported tenderness to palpation.”
Due to several delays and continuances, many of which were at the behest of D.M.S., it was not until six months after the TRO had been issued that the trial of the order of protection commenced. A week before the start of trial, on 12 September 2013, the trial judge conducted a Watermeier hearing in chambers, meeting with each of the minor children separately in order to assess their competency. See Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5th Cir.1985). Prior to the Wat-ermeier hearing, counsel for I.D.S. and D.M.S. were each | .-¡provided the opportunity to present suggested questions to assist the trial judge in her questioning of the children. Additionally, each party was allowed to have counsel present in chambers to observe the judge’s questioning and the minor children’s respective responses.
The trial judge first met with D.S., who expressed that his father hits him daily “for no reason.” D.S. proceeded to recount numerous specific occasions of recent physical abuse at the hands of his father, as well as verbal abuse, which included being called pejorative names, being slapped in the face, having his hair pulled and sustaining a cut near the corner of his eye when D.M.S. threw a remote game controller at him after having defeated D.M.S. in a video game. D.S. stated that the abuse by his father started approximately five years earlier when he was about six or seven years old. He told the judge that he was afraid to tell anyone about it for fear that his father would hurt him even more badly or possibly even kill him. He deduced that because his father has a short temper and is easily agitated, and because he has verbally threatened him to kill his mother, his father could possibly do the same thing to him. D.S. also related that his father did not feed him and M.S. breakfast before school and that often times for dinner, they were given money and left to their own devices to purchase snack food or microwave dinners from a drug store located across the street from his father’s home. According to D.S., the reason he went to the school counselor to tell her about the abuse was because he was “tired of being beaten” and is afraid of his father, so much so that he has to sleep at night with the light on when he is at his father’s house. The trial judge’s interview with D.S. concluded with D.S. expressing to her that he was terrified of his father and that he wanted his father to change and to never touch him again.
| (¡The trial judge next met with M.S., who reiterated several of the same incidences of abuse related to her by D.S. Additionally, M.S. described in detail the occasion where his father scratched his face and pulled his hair when he couldn’t timely remove the penny that was stuck in the car’s stick shift. He described his father as “freaking out” when M.S. tried to defend himself by scratching D.M.S. M.S. stated that every time he and D.S. are with their father (which is every other week), they are abused by being kicked, stepped on, thrown, or having their hair pulled, and that the abuse had been “going on for years.” M.S. also told the judge about the incident where his father told him of his intent to one day shoot his mother and grandmother. He described *1133 having had to go to bed hungry on several nights while in his father’s care. M.S. also stated to the trial judge that he was scared to return to his father’s home for fear of being attacked and hurt.
The trial of the matter commenced on 27 September 2013 and concluded on 3 October 2013. At the outset of the hearing, the trial judge explained to the parties that the issue to be determined on the Petition was a narrow one: Did D.M.S., more likely than not, commit acts of abuse upon his minor sons and threaten I.D.S. in the presence of the minor children giving rise to the filing for protection in February 2013? Accordingly, after noting that this was not a child custody proceeding or a fault trial, the trial judge advised the parties and their counsel that she was limiting the evidence and the testimony to the “four corners of the petition,” a statement she repeated throughout the two-day trial.[7]
|7I.P.S. bore the burden of proof as to the allegations contained in the Petition by a preponderance of the evidence. At trial, I.D.S. testified that D.M.S. was physically and verbally abusive towards her throughout their, five-year marriage.[8] I.D.S. identified photographs of herself and of the boys depicting physical injuries they had allegedly sustained at the hands of D.M.S. over the years.[9] She described her ongoing rancorous relationship with D.M.S. and stated that she took seriously the verbal threats D.M.S. made to the boys about wanting to inflict serious bodily harm upon her.
Ruth Meche, principal at St. Christopher’s School, and the school counselor., Sheila Nicholson, both testified at trial. According to Ms. Meche, even though she did not observe any bruising or marks on either of the boys in February 2013, she considered their allegations of abuse by D.M.S. to be credible. Ms. Nicholson testified that both boys expressed fear that their father would continue to .physically harm them and fear that he would potentially kill or injure their mother. Based on the events, described to her by the boys, first on 6 February 2013 and then again on -the morning of 8 February 2013, Ms. Nicholson determined that the severity of the abuse was sufficient to warrant involvement by DCFS.[10]
Lucille Perry, Ph.D., LPC, also testified on behalf of I.D.S. Dr. Perry stated that she has been counseling both of the boys since approximately 2005, and is |sfamiliar with patterns of abuse. In this regard, Dr. Perry testified that over the years of counseling the boys, they have expressed to her their fear of D.M.S. and she has observed, based upon their description of *1134 their father’s explosive behavior, a pattern escalating from his making mere verbal statements to them, to slapping, pushing, and pulling their .hair. Dr. Perry described the situation between the boys and their father to be a “high-risk situation,” in which, on impulse, D.M.S. could potentially “snap.” Additionally, Dr. Perry testified that the boys were fearful regarding their father’s potential retribution upon them for “telling” others about what he' had been doing to them.
The records from Children’s Hospital were jointly admitted into evidence, which included transcripts of 'the interviews of D.S. and M.S. conducted by Dr. Mehta on 11 February 2013. During these interviews, which occurred 'separately, the boys related histories of ongoing “episodés of physical abuse” by D.M.S. and recounted the same occasions of verbal and physical abuse as reported previously to their counselors. Additionally, the' boys identified photographs of themselves and described to Dr. Mehta in detail the circumstances and events that occurred, resulting in the injuries. depicted in each of .the photos. The episodes described by each child separately to Dr. Mehta did not differ in any significant respect when compared to one another. Moreover, no inconsistencies were noted when the physical findings were compared to the history provided. In fact, the finding of “slight residual scalp swelling with tenderness to palpation” during the physical examination of M.S. was consistent with the boys’ rendition of the most recent incident involving D.M.S. pulling M.S.’s hair.
In defense against the allegations set forth in the Petition, D.M.S. testified that he was blindsided by Service of the' Petition because he has never once hit or Uotherwise physically abused either of the boys. He denied that any of the incidents as described by the boys ever occurred, but rather, contends that the boys misconstrued, exaggerated, and/or fabricated the events altogether. D.M.S. accused I.D.S. of “coaching” the boys to make the allegations regarding what to say to their school counselors, the case workers at the DCFS, and the physicians at Children’s Hospital, based on the fact that in 2011, I.D.S. had previously involved DCFS and Children’s Hospital with similar complaints in an effort to systematically alienate the boys from him. According to D.M.S., the investigations conducted by DCFS on I.D.S.’s previous complaints had been largely unsubstantiated and, consequently, eventually dropped. As to the allegations in the Petition describing when and how he purportedly abused the boys in February 2013, D.M.S. introduced personal medical records from Tulane Hospital to suggest that on the specified days in question, he was actually physically incapacitated and could not possibly have abused the boys as alleged. Specifically, D.M.S. showed that he had been. undergoing a colonoscopy preparation and then the colonoscopy procedure itself on the very days the boys alleged he physically abused them. He further testified that the réason D.S.' went to the school counselors when he did was in retaliation for D.M.S. not allowing him to attend one of his school’s basketball games during that timeframe. ' Regarding the photographs identified by I.D.S. and the boys, he claims that the scratches and bruising shown were a result of the boys fighting with one another and/or occasioned during one of their sporting events. In short, according to D.M.S., the boys— and their mother—lied about him verbally and physically abusing them.
[ inThe court.also heard the testimony of D.M.S.’s current wife, -L.S.,[11] who stated that, in the time that she has been in relationship with D.M.S., he has always *1135 had a very close relationship with D.S. and M.S. L.S. denied ever striking the boys herself or witnessing D.M.S. physically strike either of the boys. She also testified that, while the boys are close to one another, they daily physically fight with one' another when in her and D.M.S.’s custody and care. Additionally, L.S. testified that she nightly fixed dinner for the family and denied that the boys ever went without breakfast or were left to “fend for themselves” for dinner while at D.M.S.’s home. As to the specific days in February 2013 when the boys claim in the Petition that they were physically abused by D.M.S., she verified D.M.S.’s weakened physical condition due to the colonoscopy preparation and his having undergone the colonoscopy procedure and stated that she did not witness nor did she believe that any physical abuse as described by the boys could have or actually did occur.
In D.M.S.’s defense, three of his adult daughters from his first marriage testified. First, his 23-year-old daughter, Mi.S., testified that, while she had on occasion seen her father yell when he got angry, he had never physically abused her nor had she ever witnessed him physically striking any of her younger brothers. She stated that she. never considered D.M.S. to have anger-management issues. She described the relationship between D.M.S- and all of his eight children to be a very close, tight-knit relationship. She also stated that D.S. and M.S. were typical brothers who constantly physically fought one another. In particular, Mi.S. testified about a fight that broke out between her brothers over the Mardi Gras weekend (which was in the days immediately following the boys having made the |nclaims of. abuse to their school counselors and DCFS, but prior to their mother obtaining the TRO and regaining their physical custody), which started when M.S. blew a horn into D.S.’s ear. D.S. then chased M.S. and “clipped him,” causing M.S. to fall head over heels. According to Mi.S., this type of physical behavior between her brothers was typical.
R.S., the eldest daughter of D.M.S;, testified that he was close to all of his children and very active in their lives and activities. She denied that D.M.S. ever physically abused her or that she had ever witnessed, him abusing any of her siblings. Additionally, R.S. confirmed that on 5 February 2013,. her father was undergoing a colonoscopy preparation and in bed most of that day. Because of his condition and inability to drive, R.S. picked D.S. and M.S. from school and brought them to D.S.’s basketball practice that afternoon and then to his game that evening. Once the game was over, she returned the boys to her father’s -home. ■ According to R.S., when they got there, she went with the boys into their father’s bedroom to Visit with him for a brief time as it was late in the evening. Once the conversation ended, she left and the boys went to bed. She did not witness any verbal or physical altercation that night. The following morning, 6 February 2013 (the day D.S. reported to his counselors the abuse by his' father), R.S. claims that she drove her father to the hospital for his colonoscopy procedure and brought ■ him ■ home thereafter. Because he was very tired, her father went straight to bed. R.S. testified that later that afternoon, she again picked the boys up from D.S.’s basketball practice and took them to his basketball game that evening. She denied that the boys seemed upset or acted unusual in any way. Following the game, R.S. stated that she brought the boys back to their .father’s house. When they-arrived home, R.S. claims she accompanied the boys into see their father and they all | ¶ ¡.spoke together briefly. It was during this conversation that D.M.S. reminded D.S. that he would be unable to attend his basketball game the following evening. She denied witnessing any harsh words, slapping, kicking, et cetera, at that *1136 time. R.S. claimed that she then left the house and the boys went to bed as it was late into the evening.
D.M.S.’s youngest daughter, C.S., testified next. According to C.S., she considers herself to be very close to both D.S. and M.S. and described their relationship as one of “open dialogue.” She denied witnessing her father ever physically strike either of her brothers or her brothers ever telling her that he had done so. It is her belief that had their father been abusing D.S. or M.S., one or both of them would have told her about it. Further, C.S. testified that when she heard ■ about D.S. and M.S.' making the .allegations against her father, her first reaction was, “like great now another time,” based on the fact that they had made similar claims in the past and, when DCFS got involved and eventually dropped the investigation, the boys admitted to her that they had-said untruthful things because they were being manipulated by their mother, I.D.S., to do so.
D.M.S. called Dr. Albert E. Sidhom, a licensed professional counselor, to testify as an expert witness on “parental and relationship issues;” in particular, the concept of parental alienation syndrome (“PAS”) and its application to the boy’s motivation for making the allegations set forth in the Petition in this case.[12] Having determined that PAS is inapplicable in a protection case, but rather, 113applies, if at all, in a child custody dispute, the trial court disallowed Dr. Sidhom to testify further and refused to qualify him as an expert to render an opinion in this case.
Dr. 'Scott Benton, an associate professor of pediatrics at the University of Mississippi Medical Center, testified by deposition on behalf of D.M.S. as an expert in pediatric forensic medicine. Dr. Benton was responsible for having established the medical procedures for handling child abuse cases at Children’s Hospital in New Orleans. Based upon. his review of the various records made available to him,[13] Dr. Benton opined that the physical findings did not rise to the level .to indicate physical abuse in this case.
At the close of the two-day trial, the trial judge issued her ruling from the bench in favor of I.D.S., finding that based on the evidence presented and the testimony of the witnesses, I.D.S. had carried her burden of proving her case “as to the allegations in the four corners of the petition for protection from abuse, and the defendant [D.M.S.] ha[d] failed to rebut the evidence.” Accordingly, the trial court issued' the order of protection at issue herein on behalf of I.D.S. and her two minor children, D.S. and M.S., for a total of eighteen months, or until 3 April 2015. The judgment rendered awarded temporary sole custody of the minor children to I.D.S., subject to supervised visitation every other Saturday or Sunday for four hours at the Orleans Parish Sheriffs Har *1137 mony House, and ordered D.M.S. to complete anger management classes and obtain professional counseling through the NCLjAbuse14 Coalition Batterer’s Intervention Program.[14] The trial court further ordered D.M.S. to pay all court costs associated with the Petition, including the trial of the matter, and $10,600.00 in attorney’s fees to counsel for I.D.S.
Prom this judgment, D.M.S. filed the instant appeal.

Issues Presented for Review

In his brief on appeal, D.M.S. set forth ten assignments of error. As several of the delineated issues are interrelated, we have consolidated them as follows:
1) Whether the trial court erred in restricting the evidence and testimony at the hearing to the “four corners” of the Petition, thereby preventing D.M.S. from being able to present a defense, including the defense of PAS;
2) Whether the trial court failed to properly weigh and consider the evidence regarding the credibility of I.D.S. and the minor children and their motivation for bringing the allegations of abuse;
3) Whether the trial court erred in extending the preliminary injunction to 18 months by failing to give him credit for the eight months that the TRO had been in effect;
4) Whether the trial court erred in its award of attorneys’ fees; and
5) Whether the trial court erred in failing to schedule a hearing as soon as possible and in not allowing Albert Si-dhom, LPC, and Dr. Klein to testify.
We note that not all of the issues raised in D.M.S.’s assignments of error are addressed in his original brief and/or his reply brief, and not all arguments presented in his briefs are assigned as error. Moreover, D.M.S. has argued numerous facts or allegations and findings of witnesses that were not presented or | ¶ ¡-^admitted into evidence at the hearing on the Petition for protection nor made part of a proffer, but rather, pertained to prior proceedings and rulings in this case relating to child custody matters.
LAW AND DISCUSSION

Domestic Abuse Assistance Statutes

Protective orders are issued in domestic violence matters pursuant to the Domestic Abuse Assistance ACT, La. R.S. 46:2131 et seq. The purpose of the law is to provide relief to victims of domestic violence by establishing a civil remedy for domestic violence that will afford the victim(s) immediate and easily accessible protection. Alfonso v. Cooper, 2014-0145, p. 13 (La.App. 4 Cir. 7/16/14), 146 So.3d 796, 805. Ship v. Callahan, 47,928, p. 4 (La. App. 2 Cir. 4/10/13), 113 So.3d 454, 456. La. R.S. 46:2135 and 46:2136 require that there be “good cause shown” for the issuance of a protective order. “Good cause shown” is defined in La. R.S. 46:2135 as a showing of “immediate and present danger of abuse.” Additionally, domestic abuse includes, but is not limited to, physical or sexual abuse or any offense against the person, as defined in the Louisiana Criminal Code, except negligent injury and defamation, committed by one family member or household member against another. La. R.S. 46:2132(3). The court may grant a protective order to bring about a cessation of abuse of a party. La. R.S. 46:2136 A.
This court and others have held that the definition of domestic abuse in La. *1138 R.S. 46:2132(3) does not incorporate nonphysical acts. General harassment and family arguments, if they do not rise to the threshold of physical or sexual abuse in violation of the criminal code, or an offense against the person, are not .within the ambit. of the Domestic Abuse Assistance Act. Harper v. Harper, 537 So.2d 282 (La.App. 4th Cir.1988); Lee v. Smith, 08-455, p. 9 (La.App. 5 Cir. 12/16/08), 4 So.3d 100, 106; Rouyea v. Rouyea, 00-2613 (La.App. 1 Cir. 3/28/01), 808 So.2d 558.

Standard of Review

An appellate court reviews domestic protective orders for abuse of discretion. Alfonso, 14-0145, p. 13, 146 So.3d at 805. Moreover, the standard of review applicable to fact findings of the trial court has been clearly enunciated by our Supreme Court in Rabalais v. Nash, 06-0999, p. 4 (La.3/9/07), 952 So.2d 653, 657:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest' error or unless it is clearly wrong ... To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes' that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where the [fact-finder’s] findings are reasonable, in light of the record reviewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s ruling is manifestly erroneous, or clearly wrong.

Discussion of Assignments of Error,

1. Admission of Evidence and Testimony

D.M.S. argues that the trial judge committed reversible error when she limited the evidence and testimony' to the “four corners” of the Petition thereby depriving him of the ability to present any defense, including evidence and testimony related to his defense of PAS. We disagree.
[17A trial judge has discretion in conducting a trial. A judge is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. La. C.C.P. art. 1631. The judge’s discretion includes the presentation of witnesses, La. C.C.P. art. 1632, as well as the admissibility of. a witness’s testimony. La. C.G.P. art. 1631. The trial judge 'has great discretion in the manner in which the proceedings are conducted before the court, and it is-only upon a showing of a gross abuse of discretion that appellate courts, have intervened. Cooper v. Lacorte, 99-1726, p. 3 (La.App. 4 Cir. 5/17/00), 775 So.2d 4, 7.
In the case sub judice, prior to the commencement of the hearing, in an attempt to prevent the matter from turning into a full-blown custody trial, the trial judge explicitly elucidated the .narrow- issue before the court; that is, whether D.M.S., more likely than not, physically abused D.S. and M.S. as specifically alleged in the.Petition for protection, and whether he made verbal threats in front of the boys to seriously harm their mother. Based upon the very limited issue for determination, the trial judge restricted both parties from presenting evidence and testimony that went beyond or was deemed unrelated to the specific allegations set forth in the Petition.[15] In this regard, the *1139 trial judge limited the testimony and evidence to only events occurring after 2009, as all other happenings had previously been presented and thoroughly considered by the court during the November 2009 custody hearing and, thus, had no bearing on the issue of protection. We find the trial judge acted well within her discretion in so ruling.[16]
|18We likewise find no merit to D.M.S.’s assertion - that the trial judge erred in refusing to allow evidence or testimony to support his defense of PAS.[17] In this regard, D.M.S. sought to qualify Dr. Albert Sidhom as an expert in order to establish his PAS defense. While Dr. Si-dhom was permitted to testify to the extent that his testimony remained within the purview of the Petition for protection, the court refused to qualify him as an expert in “parental and relationship” issues. During voir dire, Mr. Sidhom conceded that he had not interviewed I.D.S., D.S., or M.S., nor had he interviewed the boys’ counselors or the DCFS case worker who had investigated the claims. The trial judge’s refusal to qualify Dr. Sidhom to testify as an expert in this case, based upon our review of the record, was proper and not an abuse of discretion.
The trial judge also refused to permit Dr. Sidhom to testify regarding PAS. PAS has not been recognized as a relevant medical syndrome or diagnosable mental disorder by the medical community, any professional association, or Louisiana courts. It is not listed in the American Psychiatric Association’s Diagnostic and Statistical Manual of Mental ,Disorders (“DSM”). Dr. Sidhom conceded that he would not be allowed to diagnose anyone with PAS, especially someone with whom he had never met. Accordingly, the trial judge was well within the ambit of her discretion in ruling that while PAS may be relevant to a |19child custody matter, the purported syndrome has no bearing in a protection case where the sole issue for determination is whether the physical abuse, as alleged .rises to the level that an order of protection is warranted under the circumstances presented. This assignment is without merit.
2. Credibility, of .the Minor Children and their Allegations of Abuse
D.M.S. avers the trial cóurt erred when it excluded and/or failed to consider the evidence and testimony establishing the lack of credibility of I.D.S. and the boys. According to D.M.S./ the testimony and statements made by I.D.S., D.S., and M.S. were “so internally inconsistent or implausible” in light of the other testimony-and evidence admitted, that this court should *1140 disregard the trial court’s determination of their credibility. We disagree.
In matters of credibility, an appellate court gives great deference to the findings of the trier of fact. Franz v. First Bank Sys., Inc., 03-0448, p. 9 (La. App. 4 Cir. 2/11/04), 868 So.2d 155, 162 (citing Rosell v. ESCO, 549 So.2d 840 (La. 1989)). The trial court is in the best position to view the demeanor and mannerisms of the witnesses. Id. When a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact made by the trial court are not to be disturbed. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882-883 (La.1993). Moreover, where two permissible views of the evidence exist, the fact-finder’s choice cannot be manifestly erroneous or clearly wrong. An appellate court “must be cautious not to re-weigh the evidence or to substitute its own factual findings for those of the trial court.” Eisenhardt v. Snook, 08-1287, p. 6 (La.3/17/09), 8 So.3d 541, 545. The issue to be resolved by a reviewing court is whether the fact-finder’s conclusions were reasonable. Id.
|2ftAt trial, even though the trial judge ruled that the evidence and testimony were to be limited to the “four corners” of the Petition and the parties agreed that they would not refer to events occurring before 2009, D.M.S. repeatedly attempted to elicit testimony and introduce documents involving matters that preceded that timeframe. D.M.S. has attempted to do the same thing in his brief on appeal, which is replete with references to numerous events and prior court proceedings, many of which occurred well before 2009. Having previously determined that the trial judge acted within her discretion and properly excluded evidence and testimony relating to events that took place before 2009, which had no bearing on the filing of the Petition for protection in 2013, we do not consider the pre-2009 events as briefed on appeal.
In an attempt to establish inconsistencies and contradictions in the evidence and testimony relative to post-2009 events, D.M.S. submitted personal medical records and testimony substantiating that he underwent a colonoscopy preparation and co-lonoscopy procedure during the same time-frame the boys’ alleged that he inflicted physical abuse upon them. According to D.M.S., because of his weakened physical state, it would not have even been possible for him to have slapped, pushed, kicked, thrown, or pulled the boys hair as they alleged in the Petition. The trial judge obviously did not give much credence to this particular defense, in light of the surfeit of other evidence and testimony presented. We find that, while we may have weighed the evidence differently or made a different factual determination on this point, it was within the trial judge’s discretion to weight the evidence as she did. See Eisenhardt, 08-1287, p. 6, 8 So.3d at 545.
D.M.S. also argues that photographs and video clips of the boys captured at a family Mardi Gras party that occurred during the weekend immediately |2ifollowing their having complained to the school counselors and DCFS about being physically abused by their father contradict their allegations of abuse occurring in February 2013. Specifically, D.M.S. contends the photographs and videos, which depict the boys smiling and having fun, belie their testimony that they were afraid of their father and/or were subject to physical abuse by him. However, the testimony elicited by Dr. Scott Benton, D.M.S.’s own expert in pediatric forensic medicine, refutes D.M.S.’s position. Dr. Benton testified via deposition as follows:
Q. If I tell you that they were taken at the time that these incidents are alleged *1141 before—that Mardi Gras weekend before they went to Children’s Hospital 2011, from a forensic standpoint looking at those photographs, do you see any evidence of physical or child abuse?
A. When we look at what you’re talking about—this is old school. This is way back in the '60s and '70s when we used to put kids together with their alleged abuser and judge by reaction. So simply looking how someone reacts not in an abusive environment with the alleged abuser is not helpful in determining whether there’s truth or validity to the complaint.
I’ve got lots of teaching stuff to show that even a horribly abused child will go to the abuser in certain context. So it’s not helpful. It’s something to be considered, but it doesn’t make a statement other than what you see for that particular part [sic] in time, they’re happy and functioning.
D.M.S. also refers to the findings, or the lack thereof, in the records obtained from Children’s Hospital, evidencing an absence of objective injuries or physical markings noted on examination of the boys, which D.M.S. submits contradicts the boys’ claims that he was inflicting physical abuse upon them. The testimony of Dr. Benton, when taken as a whole, again refutes D.M.S.’s position.
Q. Were any of these injuries specific for child abuse?
A. No, sir.
Q. Did any of these—did the injuries rise to the level of abuse ... ?
122A. It depends on whether we can interpret the injuries in light of the history. So that’s the difficult part. I can’t answer that. If the history is true about certain things that caused the injuries, then anything that targets the head causing injury from a purposeful neglect or an intentional act I would say does rise to the level of child abuse.
Q. But you don’t see that in these records here?
A. The trouble is that we have injuries that don’t yell [sic] what happened. So that means you have to depend on that [sic] the child says. I’m not in the business of saying if the child tells the truth or not. And certainly we’re going over various things that to [sic] tend challenge [sic] perhaps whether his credibility is there. But I can’t say whether his statement is credible or not. If, after all of this analysis and other’s investigation the tryer [sic] of fact thinks that he’s telling the truth then I do think you’ve met a level that is child abuse.
Dr. Benton testified further:
Q. [F]rom what you know in this case with photographs that have been taken periodically by the mother that had been presented to people at. Children’s Hospital, the clinic that you helped develop, wouldn’t you expect that if this type of abuse was going on that there would be more photographs that would be more explicit than the nonspecific photographs that we’ve described earlier?
A. Not necessarily. I mean, there’s a lot of logical extensions on this. So first off, perhaps some of these physical findings are a manifestation of abuse that were nonspecific, doesn’t mean that it’s not [abuse]. Second, I agree that it would seem like there ought to be some more definitive thing going on. But another logical extension, I’ve seen evil parents that will specifically do abusive things that hides the marks in places where it difficult [sic] to have pattern recognition, such as a scalp or other areas of the body accidents leaving us holding the bag as to what the interpretation is.
Again, I think the safest thing is you can’t draw any conclusions from these physical findings. You can’t draw con- *1142 elusions from the absence of physical findings either. In fact, a book—chapter I recently wrote the famous phrase is the absence of evidence is not evidence, of absence.
IgaThe trial judge—the trier of fact in this case—listened to the .testimony of the witnesses and analyzed the evidence and concluded therefrom. that D.S. and M.S. were telling the truth about having been physically abused by their father. After our thorough review of the record on appeal in its entirety, we cannot say that the trial judge erred, We do not find that the documents or objective evidence submitted at the protection hearing contradicted the witnesses’ testimony, or that their testimony was so internally consistent or implausible on its face, so as to conclude that the trial court’s decision to credit LD.S.’s testimony of the events that actually precipitated the filing of the Petition for protection, as well as' to credit the testimony given by D.S. and M.S. during the Watermeier hearing, was manifestly erroneous or clearly wrong.[18] We therefore defer to the trial court’s credibility conclusions. Similarly, from this record and based upon the credibility of the witnesses, we cannot say that the trial judge abused her discretion in finding that D.M.S. committed physical abuse against each of his minor children or an offense against the person of I.D.S.[19] Under the circumstances, we find that the trial judge’s issuance of a protective order in this case was proper.
3. Extension of the Preliminary Injunction to 18 Months
In his next assignment, D.M.S. argues that it was. error for the trial court to “extend”, the preliminary injunction for an additional 18 months, thereby 124“extending the protective order for a total of 26 months,” since, at the time of its issuance on 3 October 2013, the TRO had already been in effect for approximately eight months. According to D.M.S., the trial court erroneously exceeded the maximum statutory time limit set forth in La. R.S. 46:2136 F(l), which provides, that a “final protective order or approved consent agreement shall, be. for a fixed period of time, not to exceed eighteen months.” ,,In effect, D.M.S. avers the trial court erred in failing to give him credit for the approximate eight months that the TRO was in effect.
In support of his position, D.M.S. argues that even though this is a civil matter, we should apply criminal law concepts “because the extension of the preliminary injunction to eighteen (18) months is in effect a sentence as defined by [the] Code of Criminal Procedure.” Specifically, D.M.S. urges this court to apply La.C.Cr.P. art. 880 A, which allows a criminal defendant to receive a credit towards service of a sentence for the time spent in actual custo *1143 dy prior to the imposition of the sentence. In this case, the TRO was signed by- the trial court on 8 February 2013, the date I.D.S. filed the Petition seeking protection, pursuant to the statutory authority granted in La. R.S. 46:2135, which pertains solely to temporary restraining orders. Then, at the close of the hearing on the Petition for protection on 3 October 2013,. after considering the testimony and evidence presented, the trial judge issued a separate protective order pursuant to the provisions found in La. R.S. 46:2136, which governs protective orders. In this civil matter, the time limitations set forth in La. R.S. 46:2136 do not provide for a “credit,” to which D.M.S. contends he is entitled, , for the time the TRO was in ^effect. Had the legislature intended for a credit for the duration of the TRO to be given, it would have provided for one and, absent such a provision, we decline to create or impose a credit here. This assignment is without merit.
4. Court Costs and Attorney’s Fees
D.M.S. next argues the trial court erred in awarding $10,600 in attorneys’ fees to counsel for I.D.S. because $4,500 “was incurred when defense counsel filed a lukewarm response to [his] successful Writ Application” and, the bill submitted does not specify the number of hours or detail the work counsel purportedly performed. D.M.S. submits the trial court erroneously awarded attorneys’ fees without requiring counsel for I.D.S. to prove “that there [sic] fees were actually incurred in the defense of his client.”
The Domestic Abuse Assistance Act, La. R.S. 46:2136.1 A, provides:
All court costs, attorney fees, costs of enforcement and modifications proceedings, costs of appeals, evaluation fees, and expert witness fees incurred in maintaining and defending any proceeding concerning domestic abuse assistance, in accordance with the provisions of this Part shall be paid by the perpetrator of the domestic violence, including all costs of medical and psychological care for the abused adult, or for any of the children, necessitated by the domestic violence. [Emphasis supplied.]
The statute could not be more clear—all attorneys’ fees incurred, including the costs of appeals, in maintaining and defending a proceeding concerning domestic abuse assistance are to be paid by the perpetrator; in this case, that is D.M.S. Moreover, counsel for I.D.S. submitted a detailed log delineating the fees he incurred in' maintaining and defending the Petition for protection and was questioned under oath by the trial judge regarding his fees. The trial court’s award of attorneys’ fees should not be modified absent an abuse of discretion. Schumacher Law Corp., Ltd. v. Taylor, 95-654 (La.App. 4 Cir. 11/30/95), 667 So.2d 1121, 1124. We find no abuse of the trial court’s discretion regarding its award of attorneys’ fees in this case. This assignment lacks merit.
5. Failure to Timely Schedule a Hearing and to Allow Albert Sidhom, LPC, and Dr. Klein to Testify
In his last designated assignment of error, D.M.S. avers that trial court violated this court’s order of 30 July 2013 by not scheduling a hearing as soon as possible and by not allowing his witnesses, A1 Si-dhom and Dr. Klein, to testify at trial. D.M.S.’s brief on appeal, however, does not address this assignment. According to Rule 2-12.4, Uniform Rules, Cts. of App., assignments of error not addressed in the appellate brief may be deemed abandoned and not considered.[20] Accordingly, because D.M.S. did not address this assignment in his brief, we decline to address it.
*1144 CONCLUSION
After a thorough review of the record on appeal, including the testimony of the minor children given to the trial judge during the Watemieier hearing, the testimony of the other witnesses, the evidence admitted at trial, and the evidence that was proffered, we find the trial court acted within its authority under La. R.S. 46:2135 A and 46:2136 A(l) and did not abuse its discretion in determining that sufficient proof of an immediate need for protection existed warranting issuance of |27a protective order against D.M.S. and in favor of I.D.S. and her minor children. Accordingly, the judgment granting the protective order is affirmed. Pursuant to La. R.S. 46:2136.1, all appellate costs are to be paid by D.M.S.

AFFIRMED.

McKAY, G.J., concurs.

. Because of the sensitive nature presented by the facts of this case and in order to protect the identity of the minors involved, we have chosen to use the initials of the parties and some of the witnesses in lieu of their names; although their names appear in the sealed record. See La. R.S. 46:1844 W. See also, Rules 5-1 and 5-2 of the Uniform Rules, Cts. of App; I.F. v. Administrators of the Tulane Educational Fund, 13-696, p. 3 n. 1 (La.App. 4 Cir. 12/23/13); 131 So.3d 491.

. D.M.S. filed an.expedited petition for appeal of the 3 October 2013 decision on 7 November 2013. I.D.S. filed a motion.to dismiss D.M.S.’s appeal as untimely pursuant to La. C.C.P, art. 3612, which mandates that appeals of a preliminary injunction are to be filed with 15 days from the date of judgment. Upon review, this court denied I,D.S.'s motion having determined that D.M.S.'s appeal of the trial court’s preliminary injunction was timely filed within 15 days from the denial Of his motion for new trial, This considered ruling is now the law of this case.

. On 6 February 2013, when D.S;-presented to his school counselors that he and M.S. "were being abused, they were in the physical custody of their father.

. The minor children are currently ages -14 and 12,-respectively. ..

. Because custody of the minor children had previously been determined at a custody trial in 2009, during which the presiding judge listened to lengthy testimony and reviewed voluminous exhibits regarding the relationships between the parties and the boys and made a custody ruling based thereon, the trial court instructed counsel at the beginning of the instant hearing that the testimony would be restricted to incidents occurring from 2009 to the present; any testimony relating to events occurring prior to 2009 was subject to an irrelevancy ruling.

. According to I.D.S., the physical violence she endured during the marriage included being thrown by D.M.S. onto the bed, being slapped and scratched on the face, being hit in the head, and D.M.S. putting his knee into her stopiach.

. These same photographs were presented to Dr. Mehta, who used them during her interviews with D.S. and M.S. The boys identified the photographs for her and the different circumstances resulting in the injuries captured on camera.

. The deposition of Therese Reese LaSavia, also a counselor at St. Christopher’s School, was jointly admitted into evidence at trial. Ms. LaSavia’s testimony mirrored that of Ms. Meche and Ms. Nicholson.

. D.M.S. and L.S. also have two sons together, ages four and five at the time of trial.

. PAS refers to a purported disorder (although it has not been recognized by the medical community as such), in which a child, on an ongoing basis, belittles and insults one parent without justification, due to a combination of factors, including indoctrination by the alienating parent and the child’s own attempts to denigrate the target parent. PAS is distinguished from the concept of parental alienation (estrangement of a child from a parent), in that PAS is linked to hatred and vilification of a targeted parent by the child, whereas parental alienation is linked with behaviors or symptoms of the parents.

. The medical records he reviewed included emergency room records and Audrey Hep'burn Care Center records relating to M.S. dating back to 201.0 and then all subsequent evaluations at Children’s Hospital regarding both M.S. and D.S. Additionally, he reviewed affidavits of L.S., Mi.S., the records from DCFS relative to the February 2013 incidents, and a transcript from a 19 March 2013 hearing in this case.

. The record on appeal indicates that D.M.S. failed to comply with the order of supervised visitation and has not seen either D.S. or M.S. since February 2013, and that he also failed to seek professional counseling as ordered.

. Our review of the record on appeal dem- ' ónstrates that the trial judge provided D.M.S, wide latitude in the presentation of his evidence and the questioning of his witnesses. We note that the trial was initially slated for one full day but, in an attempt to accommo *1139 date D.M.S. and provide him with the opportunity to present all relevant, admissible evi- . dence, the hearing spilled over into a second day.

. Despite the trial court’s ruling, D.M.S.’s brief on appeal, not unlike the evidence and testimony he attempted to admit into evidence at the hearing, is replete with references to and detailed descriptions of events occurring well before and up to 2009, all matters which have previously been reviewed and considered by the court in earlier proceedings and irrelevant to the issue of whether the evidence established that in February 2013, D.M.S. was more likely than not slapping, kicking, throwing, or pulling the hair of D.S. and M.S. as alleged. As noted previously, this, court gives no weight to.any of the facts and evidence referred to in the briefs submitted by D.M.S. that were hot admitted at trial or the subject of a proffer, Sée La. C.C.P. art. 1636'

. D.M.S.’s reliance on Palazzolo v. Mire, 08-75 (La.App. 4 Cir. 1/7/09), 10 So.3d 748, as authority for his argument that the trial court should have admitted evidence and testimony regarding PAS, is misplaced. Patazzolo involved a child custody dispute and not a petition for protection. We agree with the trial court that where the issue before it involves a determination of whether to issue a protective order based on allegations of physical .abuse, PAS is irrelevant,.

. On examination by the trial judge during the Watermeier hearing, both minor children separately gave detailed accounts of physical abuse upon their person at the hands of their father occurring in February 2013 and on other occasions. The photographic evidence depicting scratches and bruising on each of the boy’s person corroborated the boys’' testimony given in the Watermeier hearing that the photographs showed scratches and bruising they sustained at the hand of D.M.S. while ' they were in his care and custody.

. During the Watermeier hearing, the boys relayed incidents of verbal threats made by their father to them regarding his desire to inflict severe physical harm upon their mother and their knowledge that their father had the means {i.e„ D.M.S. showed them a gun : that he keeps in his home) with which to carry out those threats. The boys each expressed their fear that their father would kill their mother. Additionally, I,D.S. testified that she was subjected to physical abuse at the hands of D.M.S. during their marriage and that she was afraid that he would possibly harm her.

. We note that our review of the transcript of the two-day hearing on the Petition for protection reveals that, while the trial court declined, to qualify Mr. Sidhom as an expert to render an opinion regarding PAS, Ms. Si- *1144 dhom was allowed to testify as long as his testimony was relevant to the matters contained in the four comers of the Petition. After submission of his brief on appeal, D.M.S. filed with this court a motion and order to amend and/or supplement the record on appeal to include the proffered deposition testimony of Mr. Sidhom. This motion, however, cannot be considered for it fails to comply in one respect with La. C.C.P. art. 1313 B, which requires a certificate of service. We also note that the record on appeal indicates that D.M.S. never called Dr. Klein to testify as a witness.