STATE OF LOUISIANA       \*       NO. 2023-KA-0493

VERSUS       \*

      **COURT OF APPEAL**

ANTHONY JONES       \*

      **FOURTH CIRCUIT**

      \*

      **STATE OF LOUISIANA**

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 529-410, SECTION "H"
Honorable Camille Buras, Judge
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*

(Court composed of Judge Joy Cossich Lobrano, Judge Tiffany Gautier Chase, Judge Karen K. Herman)

Jason Rogers Williams
DISTRICT ATTORNEY
Brad Scott
Chief of Appeals
Patricia Amos
Assistant District Attorney
ORLEANS PARISH
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE

Christopher A. Aberle
LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470

      COUNSEL FOR DEFENDANT/APPELLANT

                                    **AFFIRMED**
                               **FEBRUARY 15, 2024**

Defendant, Anthony Jones, appeals his convictions and sentences for second degree murder and obstructing justice by evidence tampering. For the following reasons, we affirm.

**PROCEDURAL HISTORY**

On June 3, 2016, an Orleans Parish Grand Jury returned an indictment charging Defendant, Anthony Jones ("Defendant"), with one count of second degree murder in violation of La. R.S. 14:30.1, one count of obstructing justice by evidence tampering in violation of La. R.S. 14:130.1, and one count of simple criminal damage to the victim's vehicle in violation of La. R.S. 14:59(A)(1). On June 7, 2016, Defendant pled not guilty to the charges.

On November 14, 2022, the matter proceeded to trial. On November 17, 2022, once testimony had concluded, closing arguments given and instructions provided, the matter was sent to the jury for deliberations. On that same date, the jury arrived at their verdicts, finding, as to count one, that Defendant was guilty as charged of second degree murder; as to count two, he was found guilty as charged of obstructing justice by evidence tampering; and as to count three, he was found not guilty of simple criminal damage to the victim's vehicle.

1

On February 9, 2023, Defendant filed a motion for new trial and post-verdict judgment of acquittal arguing, *inter alia,* that he was denied meaningful access to counsel.[1] On that same date, the trial court held a hearing regarding Defendant's motion. At its conclusion, the trial court denied Defendant's motion for new trial based on his claim that he was denied meaningful access to counsel, noting that there was time each morning, before jury proceedings commenced, for defense counsel to confer with Defendant and time, once trial proceedings concluded for the day, for defense counsel and his client to confer. Further, the trial court noted that Defendant was found competent to stand trial on November 4, 2021, over a year before trial commenced. Thus, "that was a full year prior to trial that there was access to client for trial preparation."

On March 2, 2023, the trial court sentenced Defendant, with respect to his obstruction of justice conviction, to the "[m]aximum sentence, 40 years Department of Corrections." With regard to Defendant's second degree murder conviction, the trial court imposed the mandatory life sentence without benefit of probation, parole, or suspension of sentence. Both sentences were to run concurrently with any and all counts.

Defendant's timely appeal follows.

**STATEMENT OF FACTS**[2]

Esther Swan ("Ms. Swan"), an EMT employed by New Orleans EMS, testified that it was her responsibility to review all ambulance reports for accuracy. Ms. Swan reviewed an ambulance report for February 15, 2016, the date the

---

[1] As will be discussed herein, Defendant also raised lack of access to counsel several times during trial.

[2] While the facts established at trial are not relevant to the issue presented before this Court, we will nonetheless provide a brief recitation of the facts.

incident at issue took place. The report reflected that when ambulance personnel reached the victim, R.V., she was not breathing, she was unresponsive, and she did not have a pulse.[3] The ambulance personnel were able to "bring her back to the point where she had a pulse of 20," but she ultimately died at the hospital.

Dr. Samantha Huber ("Dr. Huber"), the Chief Forensic Pathologist for the New Orleans Parish Coroner's Office, was certified, without objection, as an expert in the field of forensic pathology. Dr. Huber performed an autopsy on the victim. The autopsy reflected that the victim suffered "multiple sharp force injuries,[4] blunt force injuries, and thermal injuries that are burns." Her death was classified as a homicide.

Detective Bruce Brueggeman ("Detective Brueggeman"), who was a homicide detective with the New Orleans Police Department at the time the incident at issue occurred, testified that he was assigned to investigate the murder of R.V. on February 15, 2016. Following his investigation, he procured a warrant for Defendant's arrest and, after Defendant was released from the hospital, he was "taken to jail."[5]

The minor children (a female and a male) of Defendant and R.V. were interviewed at the Children's Advocacy Center ("CAC").[6] The female was shown a photograph of Defendant and "she identified him as her father and the one who

---

[3] Due to the sensitive nature of the facts of the case, we have chosen to use the initials of the victim in lieu of her name. *See D.M.S. v. I.D.S.*, 2014-0364, p. 1, n. 3 (La. App. 4 Cir. 3/4/15) 225 So.3d 1127, 1130.

[4] She noted that the victim had 72 sharp force injuries.

[5] In addition to stabbing the victim, Defendant set fire to the house and, as a result of the fire, he suffered injuries requiring hospitalization.

[6] The children were minors at the time of the crime.

stabbed her mother." The male child also identified Defendant as his father and the assailant in this case.

Detective Brueggeman testified that there was no doubt in his mind that Defendant was the person who was arrested fleeing from the burning house. Further, the investigation revealed that the fire in the residence was started intentionally.

In connection with his cross-examination of Detective Brueggeman, defense counsel recalled his opening statement, reiterating that Defendant was not denying that he was responsible for the victim's death. Instead, Defendant was claiming that he was guilty of manslaughter rather than second degree murder. Detective Brueggeman admitted that he did not have evidence that Defendant had "pre-planned" to murder the victim.

On re-direct examination, Detective Brueggeman stated that when his investigation commenced, he did not know the precise weapon that was used, but he knew that numerous stabbing wounds had been inflicted and that the victim had died of her wounds. Later, a screwdriver with "dried blood on it," which Defendant had attempted to hide by "throwing it in [a] box," was located.

Louisiana State Police Trooper Sean Leboeuf testified that he was employed by the New Orleans Police Department on February 15, 2016. On that date, he was dispatched in connection with a domestic violence 911 call. When he and another officer arrived on the scene, they "were notified by a young girl that her mom was inside the house and that her dad was stabbing her with a screwdriver." The officers ultimately gained entry into the house via the back door. Defendant had barricaded the door and threw numerous "projectiles," mainly kitchen knives, at the officers to prevent them from gaining access to where he was located.

4

Thereafter, "a fire alarm smoke detector … [went] off." Smoke commenced "pouring out of the living room/dining room area to the point where we were kind of having trouble breathing." At that point, they were instructed by a lieutenant to exit the residence. Thereafter, Defendant fled the house and was detained and subsequently brought to the hospital.

Former New Orleans Police Officer Eric Vilhelmsen ("Officer Vilhlemsen") testified that in February of 2016, he was a patrol officer assigned to the Fifth District. He was notified of a domestic disturbance and, by the time he arrived on the scene, was told that the suspect had "barricaded [himself] in the residence and a victim [was] inside." Officer Vilhelmsen was located in front of the residence and was one of the officers who apprehended Defendant, and then later, along with another officer, transported him to the hospital. Officer Vilhelmsen described Defendant as being "pretty well covered" in blood.

Srivatcha Naragoni, a Senior Forensic DNA Analyst at the Louisiana State Police Crime Lab, was certified as an expert in the field of forensic DNA analysis. In connection with the matter at hand, a flat head screwdriver was submitted to the Crime Lab for analysis. A red substance was seen on the screwdriver and it was later ascertained to be blood. It was determined that the blood on the screwdriver came from the victim, R.V. Other parts of the screwdriver, where blood was not located, reflected DNA from either Defendant or a member of his male lineage.

The daughter of Defendant and the victim, testified to the events which took place on February 15, 2016. She stated that Defendant unexpectedly arrived at their home and, after he had been there for approximately thirty minutes, they all (she, her mother, Defendant and her brother) ate pizza. Once they had eaten, Defendant asked her mother to drive him to his aunt's house and her mother

5

refused.[7] Thereafter, Defendant "picked up [a] screwdriver, and he ran to my mama, and he just started stabbing her with it." At that point, the daughter fled to her bedroom to retrieve her house keys, then escaped through the front door. She ran to a neighbor's house and "told them to call the police quick because he was stabbing my mama and that she needed help."

**ERRORS PATENT**

A review of the record pursuant to La. C.Cr.P. art. 920 indicates no errors patent.

**DISCUSSION**

As his sole assignment of error, Defendant argues that he was denied his Sixth Amendment right to counsel because he was denied access to his attorney both before and during his trial.

In support, Defendant relies on *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 1337, 47 L.Ed.2d 592 (1976), a case in which the United States Supreme Court held that the trial court's order preventing defense counsel from consulting with his client during a seventeen-hour overnight trial recess violated Defendant's "right to the assistance of counsel guaranteed by the Sixth Amendment."[8] *Geders,* however, is distinguishable from the instant matter in that the trial court, in this case, played no role in denying defense counsel access to

---

[7] The daughter also indicated that Defendant had threatened her mother. She testified: "After she told him that she wasn't bringing him nowhere, he proceeded to say, 'This is my last time asking you to bring me by my auntie house.' My mom stated, 'No. You better hitchhike a ride.'"

[8] In a subsequent decision, *Perry v. Leeke,* 488 U.S. 272, 279, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989), the United States Supreme Court observed that in *Geders* "we simply reversed the defendant's conviction without pausing to consider the extent of the actual prejudice, if any, that resulted from the defendant's denial of access to his lawyer during the overnight recess." The *Perry* Court, however, remedied any question that might exist regarding the need for a showing of prejudice under such circumstances, finding that "a showing of prejudice is not an essential component of a violation of the rule announced in *Geders.*" *Perry,* 488 U.S. at 278-79, 109 S.Ct. at 599.

Defendant immediately prior to and during trial. The Court in *Geders* restricted its holding to a court order limiting a defendant's access to counsel. *Geders,* 425 U.S. at 91, 96 S.Ct. at 1337. As discussed below, any lack of access to Defendant was not the result of any court order.

On Monday, November 14, 2022, just prior to jury selection, defense counsel requested that trial be continued because jail personnel "denied me access to my client all weekend." The trial court responded that if defense counsel had sent her a text message expressing his complaint about access to Defendant, she "would have called the sheriff." Thereafter, the trial court ruled: "With all due respect, [I] will deny that motion for continuance as we are now well out from our reset date."

The following day, Tuesday, November 15, 2022, a hearing was held pursuant to which it was established that Defendant, the night before, had been transported to University Medical Center ("UMC"). At that point, defense counsel moved for a mistrial due to his lack of access to his client. The trial court, at that time, declined "to rule on the mistrial because we don't know what's going to happen with [Defendant]." The trial court noted that the medical situation could be resolved, at which point, Defendant would be available for trial.

On Wednesday, November 16, 2022, Defendant was present for trial. The record provides that Defendant was at UMC for "follow-up blood work" due to an infection that was treated with antibiotics. However, Defendant's infection had been successfully treated and he was discharged from UMC.[9] Defense counsel re-urged his motion for a mistrial, arguing that he "was not allowed access to

_____

[9] Mr. Bosworth noted the UMC medical team advised Defendant received all necessary medication and that Defendant was safe and capable of appearing for trial.

[Defendant] to prep him for trial in the days leading up to trial," though defense counsel admitted that he was able to meet with Defendant at the hospital while he "was shackled to a hospital bed with IVs in his arm." The trial court denied Defendant's motion for a mistrial, stating:

> Let the record reflect Mr. Carter [defense counsel] has been counsel on this case since March 18, 2020 and has appeared with Mr. Jones many times relative to his representation of Mr. Jones on this case.
>
> This case was set for trial October 17, 2022. Over the State's strenuous objection the Court granted a defense continuance in this matter [on] October 17, 2022 allowing the defense an additional month to prepare for trial. Therefore, in terms of preparation, Mr. Carter, for the record has had ample opportunity to prepare for this trial in the two years that he has had this case. And certainly since the October 17th reset date where I granted a defense continuance again over the strong and strenuous objections of the State.[10]

The matter thereafter proceeded to trial.

At the commencement of proceedings on Thursday, November 17, 2022, defense counsel, once again, sought a mistrial on the basis that the prior evening he was "denied … access to my client to be able to visit with him and prepare him for trial again this morning." Defense counsel stated: "This is now the seventh day in a row that the jail is not giving me access to my client. He's literally in the middle of trial. I had no ability to meet with him confidentially and go over the trial…."

In response, the trial court asked whether defense counsel had sent her a text message or had "e-mail[ed] Mr. Bosworth [the sheriff's counsel]." Defense counsel admitted that he had not taken such actions, but instead, had gone "directly to the jail." At that point, the trial court advised that if defense counsel had taken

---

[10] The trial court also noted that Defendant was treated for a non-life threatening illness and was hospitalized to follow-up on some blood irregularities or infection.

the appropriate steps he would have been able to meet with his client. The trial court stated:

> Mr. Bosworth has been here in court every time saying that he will make the defendant readily acceptable [sic] to you. And I did not receive a text or I would have interceded last night on your behalf to go see him. I don't know why you wouldn't have texted me or Mr. Bosworth for that.

Thereafter, the trial court noted that defense counsel could have privately met with his client that morning, before the commencement of trial. The trial court ascertained from a courtroom sheriff deputy that Defendant had arrived at court at 8:35 a.m. and it was presently 9:39 a.m. The trial court stated: "I always allow counsel to confer with their clients in chambers privately and I did not get the request." The trial court then denied the motion for mistrial.

After the State rested its case and the jury exited the courtroom, defense counsel claimed that while he intended to put Defendant on the witness stand, he had not had access to Defendant in order to ascertain whether Defendant desired to testify. Defense counsel stated: "I can't in good faith request my client to testify under those circumstances. However, I'm aware that it is ultimately my client's decision." At that point, the trial court noted that defense counsel has had access to Defendant the last few days of trial and that he should have consulted with Defendant prior to jury selection about whether he would testify.[11] Nevertheless, the trial judge, during the lunch recess, provided defense counsel with the opportunity to confer with his client in her chambers. Thereafter, the defense rested.

---

[11] The trial court also noted that defense counsel has "been on the case for several years;" that it had previously continued the trial to "accommodate the defense to give them more time to prepare" and that "Mr. Bosworth said he would make [Defendant] available at any time if you [had] just emailed him."

The circumstances in this case show that defense counsel had several opportunities to access Defendant and sufficient time to prepare his defense. Defense counsel represented Defendant for several years and the matter was continued over the State's strenuous objection to accommodate the defense. Defense counsel had access to Defendant throughout the trial and court recesses. Additionally, the trial court advised defense counsel on more than one occasion that if he had texted her that sheriff personnel were denying him access to Defendant at jail, she "would have interceded" on his behalf and ensured access was provided. Further, the trial court explained that all defense counsel was required to do was to request time to meet with his client privately and she would have afforded them the chance to convene in her chambers. Indeed, as noted above, when defense counsel indicated that he had not had an opportunity to discuss with Defendant whether or not Defendant should testify, the trial court readily provided defense counsel and Defendant with access to her chambers to privately discuss the matter. Arguably, defense counsel in the present case was derelict in failing to go to the trial court to obtain access to his client while at the prison.[12] This failing on defense counsel's part cannot serve as a basis to employ the rule enunciated in *Geders*.

Moreover, as the State observed in its brief, "no court in Louisiana has opined on the issue raised by [Defendant] in this case—that acts by a law enforcement agency taken without a court order to do so violate the *Geders* rule…." The issue, however, has arisen in at least two cases outside of Louisiana

---

[12] Whether defense counsel's failure to take the necessary steps to ensure a meaningful consultation with his client resulted in Defendant receiving constitutionally ineffective assistance of counsel is a question best left for post-conviction proceedings. *See State v. Williams*, 2017-0544, p. 23 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 368 ("As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.").

and, in both cases, the courts determined that the holding in *Geders* did not apply to a denial of access to counsel by jail officials.

In *de la Garza v. Fabian,* 574 F.3d 998, 999 (8th Cir. 2009), the petitioner claimed, *inter alia,* "that he was denied his Sixth Amendment right to counsel because jail officials did not permit him to communicate with his attorney during an overnight trial recess." In responding to the petitioner's invocation of *Geders,* the Eighth Circuit noted the restrictions placed on the Court's opinion in *Geders,* observing that *Geders* concerned a court order restricting the defendant's access to counsel during a trial recess and that the Court "explicitly held that it was not addressing limitations that were imposed in other circumstances." *de la Garza,* 574 F.3d at 1002 (citing *Geders,* 425 U.S. at 92, 96 S.Ct. at 1337).

Thereafter, the Eighth Circuit, after acknowledging the United Supreme Court's holding in *Perry v. Leeke,* 488 U.S. 272, 280, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989), in which the Court determined that when a *Geders* violation has occurred a showing of prejudice is not required, proceeded to distinguish both cases from the matter at hand.

> Although, at first blush, *Geders* and *Perry* appear to provide a framework in which to analyze de la Garza's case, there are key distinctions between this case and *Geders* and *Perry*…. Indeed, in *Geders* and *Perry,* the defendants were prevented from speaking to counsel **by order of the court**, while in the present case, de la Garza claims that **a jail guard would not permit him to call this attorney**. For this reason, we would affirm [the district court's denial of relief] **even if we disregarded the state court's finding that de la Garza's right to counsel was neither denied nor interfered with and accepted de la Garza's position that a guard prevented him from calling his attorney**.

*de la Garza,* 574 F.3d at 1002 (emphasis added).

In another case, *Rose v. State,* 370 Mont. 398, 304 P.3d 387 (Mont. 2013), the trial court played no role in denying defendant access to counsel, but rather, the

11

lack of access was the result of negligence on the part of defense counsel. In *Rose,* defense counsel had the opportunity to visit her client following the end of trial around 5:30 p.m. However, defense counsel did not appear at the jail until approximately 9:30 p.m. and jail personnel asked counsel to leave approximately an hour later. *Rose,* 370 Mont. at 407-08, 304 P.3d at 394. The Montana Supreme Court rejected the defendant's claim that the action of jail personnel in preventing his counsel from finishing their consultation constituted a violation of the edict in *Geders* because counsel had "the opportunity to confer with [her client]" but failed to afford herself of the opportunity. *Rose,* 370 Mont. at 408, 304 P.3d at 394.

Similarly, in the instant matter, defense counsel had the opportunity to meet with his client. A text message to the trial court requesting access would have been granted and access attained. Although defense counsel was advised to contact the trial court if access was denied by jail personnel, the record shows that defense counsel never sent a text message to the trial judge. Further, defense counsel, upon request, could have privately conferred with Defendant in the trial judge's chambers prior to trial, during breaks, or when trial proceedings had ended for the day. As such, Defendant was not denied access to his Sixth Amendment right to counsel. Accordingly, Defendant's assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we reject Defendant's argument that he was unconstitutionally denied access to counsel and affirm his convictions and sentences.

**AFFIRMED**