**KESHAWN PATTERSON**

**VERSUS**

**TACARRA CHARLES**

\*

\*

\*

\*

\* \* \* \* \* \* \*

NO. 2019-CA-0333

COURT OF APPEAL

FOURTH CIRCUIT

STATE OF LOUISIANA

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2018-12554, DIVISION "E"
Honorable Omar Mason, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*
(Court composed of Chief Judge James F. McKay, III, Judge Paula A. Brown, Judge Dale N. Atkins)

LaMarre T. Elder
Amalfi K. Parker
PARKER & ELDER LAW
1100 Poydras, Suite 2900
New Orleans, LA 70163

    COUNSEL FOR PLAINTIFF/APPELLEE


Cynthia D. Samuel
ATTORNEY AT LAW
7024 Vicksburg St
New Orleans, LA 70124

    COUNSEL FOR DEFENDANT/APPELLANT

**AMENDED, AND AS AMENDED, JUDGMENT AFFIRMED;
REMANDED WITH INSTRUCTIONS**

**SEPTEMBER 11, 2019**

Defendant-Appellant, Tacarra Charles, appeals the trial court's grant of a protective order against her filed by Plaintiff-Appellee, Keshawn Patterson. For the following reasons, we amend and as amended affirm the trial court's decision to grant the protective order and remand for the limited purpose of correcting the Uniform Abuse Prevention Order Form.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 14, 2018, Plaintiff-Appellee, Keshawn Patterson ("Patterson"), filed a petition for protection from stalking pursuant to La. R.S. 46:2171, *et seq.,* on behalf of her minor child, L.J., against Defendant-Appellant, Tacarra Charles ("Charles"), alleging that Charles harassed, stalked, harmed/threatened to harm, intimidated, and emotionally and physically abused L.J.[1] Charles is the girlfriend of L.J.'s father. The petition alleged that on or about August 22, 2018, Charles "slammed minor [L.J.] into a chair when [L.J.] tried to get up [Charles] pushed [her] back down [t]hen cut her hair." It further alleged that on prior occasions Charles had kicked the back of L.J.'s scooter causing her to fall

---

[1] This opinion will use the initials of the minor child, rather than the full name, to protect and maintain the privacy of the minor child involved in this proceeding. *Burds v. Skidmore*, 2019-0263, p. 1, n. 1 (La. App. 4 Cir. 3/22/19), 267 So. 3d 192, 193; *D.M.S. v. I.D.S.*, 2014-0364, p. 1 n.3 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1130.

1

off; threw sand in L.J.'s face; pulled L.J. underwater while she was swimming; and pushed L.J. down causing her to scrape her knee. The petition stated when Charles "does these things to [L.J.] [Charles] tells her that she better not tell anybody."

The same date as the filing of the petition, the trial court granted a temporary protective order and ordered Charles to appear on January 3, 2019 for a rule to show cause why a protective order should not be issued.

The Orleans Parish Sheriff's Office attempted to but was unable to serve Charles with the rule to show cause on December 19, 2018, December 24, 2018, and December 26, 2018. On January 1, 2019, Patterson contacted the New Orleans Police Department ("NOPD") about the temporary protective order. The police then relocated to Charles' house and provided a copy of the temporary protective order and rule to show cause.

On January 3, 2019, Patterson and Charles appeared for the hearing before the trial court.[2] Neither party was represented by counsel. L.J., who was eight years old at the time of the hearing, was also present. L.J.'s father also appeared but left to go to work before the matter was heard. At the hearing, Patterson and Charles testified. The trial court then took the testimony of L.J. in her chambers.

Patterson testified she filed the protective order against Charles on behalf of her daughter because Charles had been physically abusive and had intimidated L.J. She stated that in 2016, on two occasions, Charles had fixed L.J.'s hair too tight. She stated that in one instance, Charles had pulled L.J.'s braids into a high ponytail and it was so tight it had caused a bald spot on L.J.'s head. Patterson said that in the summer of 2018, when she advised L.J. that she was going to her father's

_____

[2] Judge Ellen Hazeur presided over the hearing on the protective order. The case was later transferred to Judge Omar Mason.

2

house for a week she cried for two days. L.J. was then placed into art therapy. Patterson stated that in June of 2018, during art therapy, L.J. had drawn a person with "orange hair… sticking up like Medusa." When the art therapist asked who that person was, L.J. advised that she was "Ms. T, the bad lady." According to the record, L.J. refers to Charles as "Ms. T."

Patterson testified that in July of 2018, Charles had hidden L.J.'s bag containing her cell phone. L.J. said when she went looking for her bag, Charles blocked the door and when she tried to maneuver around her, Charles had "kept moving toward [L.J.] like she was going to hit" her and threatened L.J. not to tell anyone what happened.

Patterson also stated she had braided L.J.'s hair for the first week of school and several days later at cheerleading practice Patterson observed that all of her braids were out. L.J. told Patterson that Charles had asked her who did her braids, and when L.J. stated "my mommy did 'em," Charles said she going to take them out. L.J. told Patterson that Charles then took her by the arm and slammed her into a chair. When L.J. tried to get up from the chair, Charles pushed her back in the chair and placed a book bag on her lap to prevent L.J. from getting up. Charles then used scissors to "cut the braids out of her hair close around [L.J.'s] neck." Patterson explained that to remove braids you cut at the bottom, so you do not actually cut the person's hair. Patterson testified that L.J. stated she could "feel the scissors close to her neck" and was "really scared." After hearing L.J. recount this occurrence as well as other events, Patterson contacted the police.

Patterson stated she did advise L.J.'s father of the braid incident. She said the police contacted him so that L.J. could pick up some of her belongings and that

3

L.J.'s father gave the police "a big runaround," dismissed the allegations of abuse, and insisted that he was supposed to have custody over L.J. at that time.

Patterson testified that L.J. was subsequently interviewed by the Children's Advocacy Center ("CAC"), and L.J. had described additional incidents involving Charles that were not previously conveyed to her. Patterson said that L.J. told CAC that Charles had kicked her scooter and caused her to fall off. L.J. also told the CAC that Charles had purposefully threw sand in her face when they were on vacation in Florida. L.J. further advised that while at a water park Charles "pushed her down on the concrete part" in the wave pool causing her to scrape her knees and that when they were in the deeper end of the wave pool, Charles "kept pulling her under the water, over and over again and she would tell [Charles] to stop [but] she would keep doing it."

Patterson stated that she received a letter from the Department of Child and Family Services ("DCFS") on October 16, 2018, advising that the information provided met the definition of child abuse or negligence and that an investigation would be conducted.[3] Patterson said a social worker from DCFS spoke to L.J.'s teacher, the school principal, and vice principal, who all indicated that L.J. had also informed them about the alleged physical abuse. DCFS continued its investigation.

Patterson testified that L.J. was supposed to see her father on Christmas but that she had a "really bad anxiety attack," was "stressed out, and crying." L.J.'s father and L.J. spoke on the phone and after her father indicated Charles was going to be present, L.J. advised she did not want to go.

---

[3] The letter referenced by Patterson is not contained in the record for appeal.

Patterson said L.J.'s father communicated to her, that despite the DCFS letter, he believed there was no case, and he was not going to prevent Charles from being around L.J. Patterson testified that DCFS advised her to file the petition for protective order to ensure Charles would not have contact with L.J.

Charles testified that all of the allegations against her were false. She said that she removed L.J.'s braids because they were unraveling, "old looking," and because L.J. had complained that the braids were falling out. Charles stated that she cut out the braids in the presence of Charles' grandmother and two cousins in the kitchen. She said that after she took L.J.'s braids out, she combed L.J.'s hair, and sent L.J. to cheerleading practice. Charles said, while at practice, L.J.'s father received a call from Patterson, stating, "you let this b*tch do anything, I'm going to show you." Charles testified that Patterson also said, "you always let this h*e comb her f***ng hair." Charles said two hours later the police called, claiming that she had slammed L.J. in a chair and cut her hair.

Charles testified that contrary to Patterson's assertions, the DCFS report did not meet the criteria for child abuse and was not accepted.[4] She said that Patterson had taken L.J. on August 23, 2018 and that she had not seen L.J. since December 15, 2018. Charles also stated that L.J.'s father received a call on Christmas day, and she overheard L.J. stating she did not want to go to her father's house if Charles was there. Charles testified that L.J.'s father said that she could just come get her presents and go home. Charles stated that she and L.J.'s father then received a text about meeting at 4:30 p.m. to pick up L.J. but that Patterson never

---

[4] Charles testified that she had a letter from DCFS, dated October 16, 2018, and the trial court instructed Charles to give to her law clerk. This letter is not contained in the record.

showed. Charles said that on January 1, 2019, the police knocked on her door with a protective order.

Charles stated that she did take L.J. to the water park but they did not have any problems. She testified she did not hear about the allegation of her pushing L.J. or any other abuse allegations until she received notice of the protective order.

The trial court then conducted a *Watermeier* hearing[5] and questioned L.J. in chambers outside the presence of either party.[6]

After hearing testimony from the parties and L.J., the trial court granted the protective order against Charles, which will expire on July 3, 2020, prohibiting Charles from contacting L.J., and ordering Charles to stay away from L.J.'s residence and school.[7]

---

[5] *See Watermeier v. Watermeier*, 462 So.2d 1272 (La. App. 5 Cir. 1985), which will be discussed *infra*.

[6] The transcript of L.J.'s testimony is sealed, and, thus, this Court will not specifically discuss the substance thereof.

[7]The trial court stated, in relevant part:

> I do find that you have met your burden for protective order against Ms. Charles.
>
> Also I have to say Ms. Charles that [L.J.'s] father is not here. One of the things that kept coming up during this hearing was that he is dismissive of the allegations of abuse and mistreatment against you. The fact that he chose to leave here and go to work, and not stay for a hearing regarding allegations of abuse against his eight-year-old daughter, I find that to be disturbing.
>
> The protective order is going to be for a period of 18 months. I'm going to read the condition so that you know exactly what you are prohibited from doing.
>
> The Defendant is ordered not to abuse, harass, stalk, assault, follow, track, monitor, or threaten the protected person in any manner whatsoever. This prohibition includes the use, attempted use or threatened use of physical force that would reasonably be expected to cause bodily injury. The Defendant is ordered not to contact the protected person personally, through a third-party, or by public posting including written, telephone, or electronic communication without the written permission of the Court. The Defendant is ordered not to go within one hundred yards of the protected person without the expressed written permission of this Court. The Defendant is ordered not to go within 100 yards of the residence of the protected person. The Defendant is ordered to stay away from the protected

The trial court, thereafter, signed the Louisiana Uniform Abuse Prevention Order Form, which provided that the protection order was issued pursuant to "La. Ch. C. art. 1564 *et seq*. (Children's Code Domestic Abuse)."

On January 30, 2019, Charles filed a motion to obtain a transcript of L.J.'s testimony taken in-chambers by the trial court. On February 1, 2019, the trial court ordered that the testimony of L.J. be "sealed due to the delicate issues involved in the case."[8]

The same date, Charles timely filed a motion for devolutive appeal, which the trial court granted. This appeal follows.[9]

## DISCUSSION AND ANALYSIS

This Court addresses the following issues: (1) the sufficiency of evidence to support the trial court's issuance of the protective order on the petition for protection from stalking; (2) the trial court's authority to enter a protective order under La. Ch. C. art. 1564 *et seq*., on Uniform Abuse Prevention Order Form; (3) the manner in which the trial court conducted the *Watermeier* hearing; (4) the sealing of the transcript of L.J.'s testimony; (5) if Charles received sufficient notice of the rule to show cause for the hearing on the protective order; and (6) whether Charles was denied due process at the hearing on the protective order.

---

persons school and not to interfere in any manner whatsoever with such employment or school and the school name and address is in the protective order.

\* \* \*

This protective order is effective through 11:59 P.M. on July the third, year 2020.

[8] Judge Omar Mason issued the order sealing the transcript. The case was transferred to Judge Mason subsequent to the January 3, 2019 hearing. *See* n. 2.

[9] The appeal was expedited by this Court pursuant to Rule 5-1 of the Uniform Rules, Courts of Appeal.

*Sufficiency of Evidence on the Protective Order*

Charles argues that it was error for the trial court to grant a protective order on a stalking petition because the testimony adduced at trial failed to establish the legal elements of the crime of stalking.

An appellate court reviews domestic protective orders for an abuse of discretion. *See Rodriguez v. Claassen*, 2016-0610, p. 3 (La. App. 4 Cir. 12/21/16), 207 So.3d 490, 493; *Alfonso v. Cooper*, 2014-0145, p. 13 (La. App. 4 Cir. 7/16/14), 146 So.3d 796, 805. The trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. *Alfonso*, 2014-0145, pp. 13-14, 146 So.3d at 805 (citing *Ruiz v. Ruiz,* 2005-175, p. 4 (La. App. 5 Cir. 7/26/05), 910 So.2d 443, 445).

Patterson petitioned the trial court for an order of protection from stalking, pursuant to La. R.S. 46:2171, *et seq.,* known as the "Protection from Stalking Act."[10] Under this Act, "stalking" means "any act that would constitute the crime of stalking under R.S. 14:40.2 or cyberstalking under R.S. 14:40.3." *See* La. R.S. 46:2172.

---

[10] The statement of purpose of the Act is set forth in La. R.S. 46:2171, which provides:

> The legislature hereby finds and declares that there is a present and growing need to develop innovative strategies and services which will reduce and treat the *trauma of stranger and acquaintance stalking*. The nature of stalking allegations are sometimes not easily substantiated to meet the prosecution's burden of proving the case beyond a reasonable doubt, and victims of stalking are left without protection. Orders of protection are a proven deterrent that can protect victims of stalking from further victimization; however, many victims are forced to pursue civil orders of protection through ordinary process, often unrepresented, rather than through a shortened, summary proceeding. Additionally, victims of stalking are not always aware of the vast resources available to assist them in recovering from the trauma associated with being a victim of stalking. *It is the intent of the legislature to provide a civil remedy for victims of stalking that will afford the victim immediate and easily accessible protection.* [Emphasis added].

La. R.S. 14:40.2(A) provides:

Stalking is the intentional and repeated following or *harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include* but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or *behaviorally implied threats of* death, *bodily injury*, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted. [Emphasis added].

"Harassing" is defined as "the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures." La. R.S. 14:40.2(C)(1). A "pattern of conduct" means "a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person." La. R.S. 14:40.2(C)(2). Additionally, because stalking is an offense against the person in the Louisiana Criminal Code, it constitutes domestic abuse for purposes of the Domestic Abuse Assistance statutes. *Lepine v. Lepine*, 17-45, pp. 11-12 (La. App. 5 Cir. 6/15/17), 223 So.3d 666, 675*; see also* La. R.S. 46:2132(3).

At a hearing on a protective order, the petitioner must prove the allegations of abuse by a preponderance of the evidence. *See* La. R.S. 46:2135(B). Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not. *Head v. Robichaux*, 2018-0366, pp. 3-4 (La. App. 1 Cir. 11/2/18), 265 So.3d 813, 816 (citing *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So.2d 564, 578).

Charles argues that while Patterson testified regarding many allegations none of them amounted to stalking because there is no indication that Charles "followed and harassed" L.J. However, stalking is not defined as being followed *and* harassed, the statute provides stalking can result from the intentional repeated "following *or* harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress." La. R.S. 14:40.2(A) (emphasis added).

Here, Patterson provided testimony indicating that Charles had taken L.J.'s phone, approached L.J. as if Charles was going to hit her, and threatened L.J. not to "tell anyone" about the incident. Patterson said that Charles had thrown sand in L.J.'s face, held her down under water, and kicked her off of her scooter. Patterson stated that Charles had forced L.J. to sit in a chair and cut out L.J's braids in an intimidating fashion. Patterson also testified that L.J. advised her that she was scared and could feel the scissors near her neck during the incident. Moreover, L.J.'s in-chambers testimony corroborated Patterson's statements.

Although Charles denied the allegations against her and asserted that she had cut out L.J.'s braids because they were old and falling out, the trial court was entitled to believe Patterson and L.J.'s testimony over Charles' version of events.

The trial court's findings of fact, including its assessment of the weight of the evidence and the credibility of the witnesses, may not be set aside in the absence of manifest error or unless they are clearly wrong. *Shaw v. Young*, 2015-0974, p. 4 (La. App. 4 Cir. 8/17/16), 199 So.3d 1180, 1183 (citing *Sander v. Brousseau,* 2000–0098, p. 3 (La. App. 4 Cir. 10/4/00), 772 So.2d 709, 710–11). When a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact made by the trial court are not to be disturbed upon

10

review, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. *Id*. (citing *Melerine v. O'Connor,* 2013–1073, p. 3 (La. App. 4 Cir. 2/26/14), 135 So.3d 1198, 1202). As long as the trier of fact's findings are reasonable in light of the record as a whole, the appellate court will affirm. *Id*. (citing *Mazzini v. Strathman,* 2013–0555, p. 4 (La. App. 4 Cir. 4/16/14), 140 So.3d 253, 256).

Considering the discretion bestowed upon the trier of fact in the evaluation of witnesses and the testimony that Charles asserted physical force against L.J. and/or intimidated L.J. on several occasions and that L.J. was fearful of Charles, there is sufficient evidence for the trial court to conclude that Patterson established by the preponderance of the evidence that Charles engaged in a repeated pattern of conduct that would reasonably cause L.J. to feel alarmed or suffer emotional distress.[11] Accordingly, the trial court did not abuse its discretion in granting the protective order for stalking against Charles.

Charles also contends that this case merely involves strife in domestic matters and does not arise to the level of stalking or behavior that would justify a protective order. She relies on *Culp v. Culp*, 42,239 (La. App. 2 Cir. 6/20/07), 960 So.2d 1279, which involved a custody dispute over a child and conflicting testimony over whether the father had swung a belt in the direction of the mother and child to get the child to go with him on his visitation. There was also a phone conversation wherein, the child was "negotiating" between his parents. The trial

---

[11] Charles argues in her reply brief that Patterson's testimony about L.J's alleged abuse is hearsay. *See* La. C.E. art. 801(C) (defining "hearsay" as a "statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted"). However, even without considering hearsay evidence, L.J.'s statements to the trial court during her in-chambers interview supports the trial court's finding. Furthermore, Charles did not object to Patterson's testimony and thus cannot raise it for the first time on appeal.

court found that the belt incident did not constitute either a battery or an assault; however, the trial court did find that "the evidence supported a finding of harassment on the part of Defendant toward Plaintiff [the mother] and the child." The trial court stressed the phone conversation in which the child was given the phone to negotiate for his father's visitation. As a result, the trial court found that the statute entitled the mother to a protective order. *Culp*, 42,239, p. 5, 960 So.2d at 1282. However, the Second Circuit found that an argument between family members did not amount to physical abuse and that protective orders should not issue from an unpleasant exchange, parent bickering, or child manipulation.  The *Culp* Court stated, in pertinent part:

> La. R.S. 46:2131, *et seq.,* provides protection in the form of TROs and protective orders for persons subject to domestic abuse. Domestic abuse is further defined by La. R.S. 46:2132(3), in pertinent part, as:
>
> > includes, but is not limited to physical or sexual abuse, and any offense against the person as defined in the Criminal Code of Louisiana, except negligent injury and defamation committed by one family or household member against another.[12]
>
> Family arguments that do not rise to the threshold of physical or sexual abuse of violations of the criminal code are not in the ambit of the Domestic Abuse Assistance Law. *Rouyea, supra; Harper v. Harper,* 537 So.2d 282 (La. App. 4[] Cir.1988).
>
> Plaintiff emphasizes that the definition uses the phrase "includes, but is not limited to" and argues that this language expands the scope of domestic abuse to include general harassment. We disagree. *We are mindful that the courts could quickly be overwhelmed if every unpleasant child custody exchange or contentious relationship between former spouses warranted a TRO or protective order*. The kind of *parent bickering and child manipulation* that the record reflects occurring between the parents in the case *sub judice is simply beyond the scope of this statute*. La. R.S. 46:2131 emphasizes that the purpose of the statute is to equalize the treatment

---

[12] La. R.S. 46:2132(3) has since expanded the definition of abuse to acts committed by a "dating partner against another" and the "abuse of adults as defined in R.S. 15:1503 when committed by an adult child or adult grandchild."

of crimes between family members and those between strangers. *It further emphasizes the need to protect victims from violent behavior.* Those purposes reflect that the D.A.A. has a limited reach. We cannot agree, therefore, that the statute embodies Plaintiff's claims of general harassment by Defendant, nor do the Defendant's actions as contained in the record constitute an offense against a person as defined by the Criminal Code. [Emphasis added].

*Culp*, 42,239, pp. 6-7, 960 So.2d at 1282–83.

The Court further stated that the only incident that arguably falls within the scope of domestic abuse was the belt incident. However, because the trial court found that "the belt incident constituted neither battery nor assault" it did not find an abuse of discretion. *Culp*, 42,239, p. 7, 960 So.2d at 1283.

Here, unlike *Culp*, there was evidence that Charles made physical contact with L.J. and engaged in behaviors that could constitute stalking and thus falls within the realm of the domestic abuse. As discussed above, the testimony presented to the trial court provides that Charles made threats against L.J., pushed her down, physically intimidated L.J., and caused her to be frightened of Charles. The facts set forth in the instant case were more than the mere bickering and the familial conflict presented in *Culp*. As such, there is sufficient evidence to support the trial court's decision to enter a protective order against Charles. Accordingly, the trial court's finding that Charles committed domestic abuse by stalking was not manifestly erroneous or clearly wrong.

### *Authority to Issue the Protective Order*

Charles also argues that the trial court erred in that it executed the protective order and granted the order pursuant to La. Ch. C. art. 1564 *et seq*. Charles contends that the Civil District Court does not have jurisdiction over matters in Chapter 8, Title XV of the Children's Code because it is reserved exclusively to the juvenile court.

13

La. R.S. 46:2136.2(C) requires trial courts to use a "uniform form for the issuance of any protective or restraining order" called the "Uniform Abuse Prevention Order." The trial court then checks off a box provided on the uniform form to indicate under which law it issues the temporary restraining order and/or protective order: (1) La. R.S. 46:2131, *et seq.* (Domestic Abuse); (2) La. R.S. 46:2151, *et seq.* (Dating Violence); (3) La. R.S. 46:2171, *et seq.* (Non-intimate stalking); (4) La. R.S. 2181, *et seq.* (Non-intimate sexual assault); (5) La. Ch.C. art. 1564, *et seq.* (Children's Code Domestic Abuse); or, (6) a court approved consent agreement. *Head v. Robichaux*, 2018-0366, pp. 3-4 (La. App. 1 Cir. 11/2/18), 265 So.3d 813, 816 (citing *Scott v. Hogan,* 2017-1716, p. 9 (La. App. 1 Cir. 7/18/18), 255 So.3d 24, 31).

While Patterson filed a petition for an order of protection from stalking, when the trial court completed the Uniform Abuse Prevention Order, it checked the box indicating the order was issued under "La. Ch.C. art. 1564 *et seq.* (Children's Code Domestic Abuse)." [13] Charles acknowledges that this selection may have been inadvertent on part of the trial court. Nevertheless, Charles argues that La. Ch. C. art. 307 sets out "[j]uvenile jurisdiction over adults in proceedings involving the care, custody, or control of a child" and states:

> A. A court exercising juvenile jurisdiction shall have exclusive original jurisdiction over adult parties in the following cases involving the care, custody or control of a child:
> * * *
> (6) Special proceedings pursuant to Title XV.

La. Ch. C. art. 307(A)(6).

---

[13] The record indicates that the trial court initially completed the box for a protection order pursuant to "La. R.S. 46:2131, *et seq.* (Domestic Abuse), but used liquid whiteout over that selection and then checked the box for protection under La. Ch. C. art. 1564, *et seq.*

Charles claims that because La. C. Ch. art. 1564, *et seq.*, is contained in Title XV of the Children's Code any protective ordered rendered thereto is solely within the jurisdiction of the juvenile court and this trial court is without jurisdiction to render such an order. However, La. Ch. C. art. 307(A)(6) provides that a "*court exercising juvenile jurisdiction* shall have exclusive original jurisdiction" over Title XV special proceedings. Thus, a juvenile court has exclusive jurisdiction over such matters if it originally was initiated in juvenile court. Here, there is no indication there is any related case pending in the juvenile court.

Furthermore, the Protection from Stalking Act is intended to "provide a civil remedy for victims of stalking that will afford the victim immediate and easily accessible protection." La. R.S. 46:2171. The legislature provides "[a]ny district court in the state of Louisiana which is empowered to hear civil matters shall have jurisdiction over proceedings appropriate to it under this Chapter [Protection from Stalking Act]." La. R.S. 46:2171.1.

Additionally, under the Domestic Abuse Assistance statutes the trial court has jurisdiction because any parent may seek relief on behalf of any minor child by filing a petition with the trial court. La. R.S. 46:2133 provides, in relevant part:

> A. Any court in the state of Louisiana which is empowered to hear family or juvenile matters shall have jurisdiction over proceedings appropriate to it under this Part.
> * * *
> D. An adult may seek relief under this Part by filing a petition with the court alleging abuse by the defendant. *Any parent,* adult household member, or district attorney *may seek relief on behalf of any minor child* or any person alleged to be incompetent by filing a petition with the court *alleging abuse by the defendant*. A petitioner's right to relief under this Part shall not be affected by leaving the residence or household to avoid further abuse. [Emphasis added].

Although Patterson filed a petition for protection from stalking she was eligible to receive all services, benefits, and other forms of assistance under the

Domestic Abuse Assistance statutes "provided the services, benefits, and other forms of assistance are applicable based on the status of the relationship between the victim and perpetrator." *See* La. R.S. 46:2173. Under La. R.S. 46:2132(3) domestic abuse includes offenses committed by family members, household members, or dating partners. Here, Charles is the girlfriend of L.J.'s father and is alleged to have harmed L.J. The Domestic Abuse Assistance laws would apply to the present case and L.J. would be entitled to the benefits thereof.[14] Moreover, cases have employed the provisions of the Domestic Abuse Assistance statues to petitions for protection from stalking between mere acquaintances. *See Head*, 2018-0366, 265 So.3d 813; *Scott*, 2017-1716, 255 So.3d 24. Thus, it would appear that Patterson had the right to bring the petition against Charles in the venue she believed had jurisdiction to afford L.J. immediate and easily accessible protection from stalking and abuse.

However, as discussed above, the trial court did not actually grant a protective order under the Protection from Stalking Act or under the Domestic Abuse Assistance laws, it granted the order pursuant to La. Ch.C. art. 1564 *et seq.*, the Children's Code Domestic Abuse. Domestic abuse under the Children's Code for domestic abuse assistance must be committed by a family member or household member. La. Ch. C. art. 1565(1). Also, a household member is "any person living in the same residence with the defendant as a spouse whether married or not if a child or children also live in the residence." La. Ch. C. art. 1565(2). Here, there was no evidence adduced at trial that Charles lives in the same

---

[14] The parties do not appear to dispute that provisions of the Domestic Abuse Assistance laws apply to the instant case. In fact, Charles references the Domestic Abuse Assistance statutes to support her arguments, including the notice requirements for the issuance of a protective order.

household as L.J.'s father and thus was not a member of a household under La. Ch. C. art. 1565.

In *Head*, the plaintiff sought a protective order from stalking for herself against the defendant, who was an acquaintance of the plaintiff and her boyfriend. The plaintiff alleged that the defendant harassed her, threatened her, and made or sent telephone calls, texts, emails, or other electronic communications to her. A temporary restraining order was issued and following a hearing, the trial court "signed a permanent order of protection, pursuant to the Domestic Abuse Assistance statutes." *Head,* 2018-0366, p. 2, 265 So.3d at 815. The First Circuit found that because the plaintiff requested a protective order under the stalking statutes and there was evidence to support a finding of stalking, it amended the judgment to show that the protective order was issued under the anti-stalking act. The Court stated:

> [W]e note that although Ms. Head requested that the trial court issue a protective order pursuant to the anti-stalking statutes, the trial court checked the box for protection from domestic abuse when it granted the permanent injunction. Yet, in the section labeled "[t]he protected person(s) is related to the defendant as: (check all that apply)," the trial court only checked the box identifying the relationship between Ms. Head and Mr. Robichaux as an "acquaintance," for "(s)talking or sexual assault only," and failed to check any other relationship between the parties. Therefore, considering that Ms. Head requested protection from stalking only and that the evidence clearly supports a finding of stalking, we hereby amend the protective order to show that it is issued pursuant to "La. R.S. 46:2171 et seq. (Non-intimate stalking)," and, as amended, the judgment granting the permanent protective order in favor of Jessica Head is affirmed.

*Head*, 2018-0366, p. 8, 265 So.3d at 819.The *Head* Court then remanded the case for "the limited purpose of correcting" the Uniform Abuse Prevention Order Form.[15] *Id.*

Here, as noted earlier, there is no indication that Charles is a household member and thus La. C. Ch. art. 1564, *et seq.*, would be inapplicable. However, as discussed above, there is evidence of stalking to support the protective order under anti-stalking statutes and Patterson requested protection from stalking. Accordingly, pursuant to *Head*, this Court will amend the order and remand for the limited purpose of correcting the Uniform Abuse Prevention Order to show that it was issued under La. R.S. 46:2171, *et seq.* (Non-intimate stalking).

### Watermeier Hearing

Charles claims that trial court erred in the method in which it conducted the *Watermeier* hearing. Charles argues that the trial court failed to conduct any type of competency interview of the child; failed to administer any age-appropriate oath

---

[15] This Court is aware of another First Circuit case, *Scott*, 2017-1716, 255 So.3d 24, which reached a different result than the *Head* Court and vacated a protective order instead of amending and affirming the order. In *Scott,* a female coworker petitioned for a protective order from stalking or sexual assault, pursuant to La. R.S. 46:2171, *et seq.* (Protection from Stalking Act) or La. R.S. 46:2181, *et seq.* (Protection for Victims of Sexual Assault Act) against her ex-coworker alleging that he harassed, stalked, harmed or threatened to harm her, was an uninvited presence at her workplace, and had sent mail to her residence addressed to himself. Following a hearing, the trial court signed the order of protection pursuant to the Protection for Victims of Sexual Assault Act, "La. R.S. 46:2181 *et seq.* (Non-intimate sexual assault)." On appeal, the ex-coworker-defendant alleged that the plaintiff did not show good cause that she was entitled to an order of protection because she did not show an immediate or present danger of abuse, nor did she prove that she was a victim of sexual assault. The First Circuit found that while the actions of the defendant could violate the statutes on stalking, there was no evidence of allegations of sexual assault. The Court "recognized that the trial court may have inadvertently checked off the box for protection against sexual assault ('La. R.S. 2181, *et seq.* (Non-intimate sexual assault)') instead of the box for protection against stalking ('La. R.S. 46:2171, *et seq.* (Non-intimate stalking)') on the Louisiana Uniform Abuse Prevention Order form." *Scott*, 2017-1716, p. 13, 255 So.3d 24, 33. Nevertheless, the Court found that the trial court abused its discretion in issuing the order of protection for victims of sexual assault and vacated the protective order and remanded the case for further proceedings. However, we find the conclusion reached in *Head* more persuasive.

whatsoever; and asked questions that were overly leading, and not relevant to the legal question before the court– stalking.

Patterson argues, however, that a determination of child competency does not need to be separate and apart from the questions relating to the case itself. She further claims that the trial court is granted "the utmost deference" in calculating whether the child is competent. Patterson also contends that the questions during the *Watermeier* hearing, leading or otherwise, are likewise reserved for the determination of the trial court.

"A '*Watermeier* hearing' is a hearing in chambers, outside the presence of the parents, but in the presence of their attorneys, with a record of the hearing to be made by the court reporter, to inquire as to the competency of a child to testify as to custody." *S.L.B. v. C.E.B.*, 2017-0978, p. 13, n. 12 (La. App. 4 Cir. 7/27/18), 252 So.3d 950, 960, *writ denied,* 2018-1442 (La. 11/20/18), 256 So.3d 992 (quoting *In re D.C.M.*, 2013-0085, p. 6 n.9 (La. App. 1 Cir. 6/11/13), 170 So.3d 165, 168).

This Court has noted that *Watermeier* hearings are typically conducted in the context of child custody disputes. *S.L.B.*, 2017-0978, p. 14, n. 14, 252 So.3d at 964. Indeed, in *Watermeier,* the "issue was whether, during a custody hearing and over the objection of counsel for one of the parties, the trial court could conduct an unrecorded, in-chambers interview of the minor children." *Id.* (quoting *Sorrells v. Sorrells*, 2015-500, p. 9 (La. App. 3 Cir. 11/4/15), 178 So.3d 288, 294). However, courts have conducted a *Watermeier* hearing in the context of a petition for protection from domestic abuse. *S.L.B.,* 2017-0978, p. 13, 252 So.3d at 961 (the trial court granted the defendant's request for a *Watermeier* hearing in response to the plaintiff's deposition notice of their two children in a case which arose under

19

the Domestic Abuse Assistance Act); *D.M.S. v. I.D.S.*, 2014-0364, pp. 4, 23 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1132, 1142 (conducting a *Watermeier* hearing in-chambers to assess the competency of minor children prior to the trial on the order of protection from domestic abuse).

The trial court has discretion in evaluating a child. *See Bourque v. Bourque*, 03-1254, p. 5 (La. App. 5 Cir. 3/30/04), 870 So.2d 1088, 1092 (whether or not to allow a child to testify in child custody proceeding is a matter of trial court's discretion).

In *Watermeier*, as noted above, the Fifth Circuit found that the trial judge has the right to conduct an interview in chambers outside the presence of parents as long as it was in the presence of their attorneys with a record being made by court reporter. It also found that "[w]hether the minor child has proper understanding, such that he will be allowed to testify, is a matter within the discretion of the trial judge." *Watermeier*, 462 So.2d at 1274 . The competency of the child is determined by the trier of fact and the competency test shall be whether he is "a person of proper understanding." *Id*. The *Watermeier* Court stated:

> [W]e hold that the interview must be conducted in chambers outside of the presence of the parents, but in the presence of their attorneys, with a record being made by the court reporter. The judge shall first determine his competency as "a person of proper understanding" by interrogating the child with appropriate questions. *The attorneys <u>shall be allowed to participate in the competency examination by asking questions and registering appropriate but only necessary objections</u>.* If the judge determines that the child is not a competent witness as outlined above, he shall immediately terminate the interview.
>
> However, if the judge determines that the child is competent, he may continue the interview in the presence of the attorneys as observers only. They shall not participate by asking questions, or cross-examining or registering objections, as we deem this would upset, distract and possibly intimidate the child to a degree that would undermine his willingness to give any useful information.
> * * *

20

> *We do not intend or direct that the above procedure is ordained or is mandatory when there is no objection from either side regarding the examination of any child by the judge. In such case, the trial judge may examine any child or witness in chambers, on or off the record, and with or without parents and/or counsel being present-provided all agree on the procedure.* [Emphasis added].

*Watermeier*, 462 So.2d at 1275.

Charles claims that because the *Watermeier* Court used the word "shall," the competency determination is mandatory and the trial court failed in declining to do so. She also argues the trial court did not administer an age appropriate oath. *See* La. C.C.P. art. 1633 (stating "[b]efore testifying, every witness shall be required to declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with his duty to do so").

In the instant case, a review of the record shows that after the trial court explained that L.J. was being questioned in relation to a dispute between her mother and Charles, the trial court began inquiring how L.J. knew Charles, when they met, L.J.'s age, and how Charles acted towards her. The trial court did not ask questions regarding L.J.'s understanding of the truth nor did it specifically question her comprehension. However, as noted by Patterson, *Watermeier* does not delineate which questions are to be asked to assess the child's competency. The questions posed by the trial court are catered to the emotional and intellectual abilities of an eight year old, L.J.'s age at the time of trial. The trial court did not subject the child to extended questioning and asked about the specific allegations against Charles. Additionally, L.J. did not appear to be confused by any of the questions. Moreover, the trial court is in a unique position to see and hear the witnesses and thus is awarded discretion in its assessment thereof. There is nothing in the record that suggests that L.J. was not competent to testify about Charles's

21

conduct towards her. *See Watermeier*, 462 So.2d at 1273–74 (determining the competency of the witness is within the sound discretion of the trial judge).

While the *Watermeier* Court determined "**a** proper procedure for the handling of a child's testimony," the Fifth Circuit Court in *Penn v. Penn*, 09-213, p. 5 (La. App. 5 Cir. 10/27/09), 28 So.3d 304, 307, "made it clear that this procedure was not mandated" where there was no objection or agreement by the parties to another procedure. *Id.* (emphasis in original). Here, no party raised the issue of L.J.'s competency at the hearing nor did they object to the trial court's decision to conduct the interview outside Patterson and Charles' presence. Thus, the trial court was not bound to strictly follow the dictates of *Watermeier*.

Additionally, there does not appear to be any jurisprudence which requires that a child be sworn during a *Watermeier* hearing. In fact, Judge Tobias, recently in a dissent opinion, specifically stated:

> My appreciation of the purpose [of] a "*Watermeier* hearing" is to ascertain whether a *child* of tender years is capable of testifying truthfully and whether the child should be subjected to cross-examination by counsel for the parties on the issue of custody. **A child is not sworn for purposes of the hearing**. [Italics in original, bolded text added].

*In re Benson*, 2015-0874, p. 17 (La. App. 4 Cir. 2/24/16), 216 So.3d 950, 962 (Tobias, J., dissenting) (footnote omitted); *see also State v. Pace,* 301 So.2d 323, 325 (La. 1974) (a formal oath is not always required as a condition precedent to receiving the testimony of young children, and much discretion of this regard is left to the trial judge).

Moreover, it is within the discretion of the trial court to determine the appropriate manner to question a child. It is well settled that leading questions may be propounded upon a child witness. *See* La. C.E. art. 611(C) ("when … a witness

22

who is unable or unwilling to respond to proper questioning… interrogation may be by leading questions"); *State v. Kahey*, 436 So.2d 475, 493 (La. 1983) (leading questions may be asked during direct examination if the witness is a child, is mentally deficient, or has some other difficulty in testifying); *State v. Casimier*, 454 So.2d 1199, 1204 (La. App. 4 Cir. 1984).[16] Contrary to Charles' assertions, most of the inquiries concerned Charles' alleged abusive and harassing behavior with regard to L.J. and thus was related to the allegations of stalking. Accordingly, the trial court did not abuse its discretion in the manner in which it conducted the *Watermeier* hearing.

### *Sealed Testimony of L.J.*

Charles further argues that the trial court erred in ordering the transcript of L.J.'s testimony to be sealed as a matter of "standard operating procedure" rather than conducting the mandatory constitutional analysis set out by the Louisiana Supreme Court in *Copeland v. Copeland*, 2006-1023 (La. 6/2/06), 930 So.2d 940 ("*Copeland I*") and *Copeland v. Copeland,* 2007-0177 (La. 10/16/07), 966 So.2d 1040 ("*Copeland II*").[17]

The order sealing the transcript stated that the hearing conducted with L.J. on January 3, 2019 was "sealed due to the delicate issues involved in the case."

---

[16] *See also* La. C.E. art. 611(A) (providing that the trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) [m]ake the interrogation and presentation effective for the ascertainment of the truth; (2) [a]void needless consumption of time; and (3) [p]rotect witnesses from harassment or undue embarrassment").

[17] It is well-settled that although an interlocutory judgment, such as the trial court's decision to seal L.J.'s testimony, may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment is rendered in the case which is appealable. *Favrot v. Favrot*, 2010-0986, p. 2, n. 1 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1102. When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment." *Id.* (quoting Roger A. Stetter, *Louisiana Civil Appellate Procedure,* § 3:32 (2010–2011 ed.)).

A trial court has discretion in the sealing of a court record. *Copeland II*, 2007-0177, p. 6, 966 So.2d at 1045. Although Louisiana has no specific statutory provision allowing trial courts to seal court records, general provisions exist under which trial courts exercise this power. *Id.; see* La. C.C.P art. 191 (providing that "a court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law"); La. C.C.P. art. 1631(A) (provides that "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done"); *see also Opelousas Gen. Hosp. Auth. v. Fairpay Sols., Inc.,* 2013-17, p. 6 (La. App. 3 Cir. 7/3/13), 118 So.3d 1269, 1275 (while there is no statutory provision permitting a trial court to seal court records, pursuant to its supervisory powers it has discretion in sealing records based on the facts and circumstances of the case; it is within the trial court's purview to decide if information is sensitive such that it should not be disclosed to others).

In *Copeland I* and *Copeland II*, the Louisiana Supreme Court addressed the rights of litigants to have court records sealed in the context of the high profile divorce proceedings of Alvin Copeland and his wife. Although the parties jointly requested that the records be sealed, the Times-Picayune newspaper intervened, seeking access to the records. Copeland and his wife argued that sealing the divorce record was necessary for the safety and protection of their children. The trial court conducted a hearing and issued a ruling which sealed all of the substantive pleadings except for the initial petition for divorce. The matter came before the Louisiana Supreme Court on a writ application filed by the Times-Picayune.

In limiting the circumstances under which parties could have records sealed and protected from public access, the Louisiana Supreme Court considered United States Supreme Court precedent holding that trials are public events; that what transpires in a courtroom is public property; and that the public has a right to inspect and copy public court records. *Copeland II,* 2007–0177 at p. 3, 966 So.2d at 1042–43 (citing *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); and *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). The Court pointed out that the Louisiana Constitution provides that "[a]ll courts shall be open" and "[n]o person shall be denied the right to observe the deliberations of public bodies and examine public records, except in cases established by law." *Id*. at p. 8, 966 So.2d at 1045 (citing La. Const. art. I, § 22 and art. XII, § 3). The *Copeland* Court also recognized that not all records need necessarily be accessible to the public. The Court noted that the decision regarding access to sensitive information is best left to the sound discretion of the trial court, which has the general authority to seal all or part of a record when appropriate. *Id*. at p. 6, 966 So.2d at 1044–45 (citing *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 599, 98 S. Ct. 1306, 1312, 55 L. Ed. 2d 570 (1978); *Bester v. Louisiana Supreme Court Committee on Bar Admissions*, 2000-1360, p. 12 (La. 2/21/01), 779 So.2d 715, 721; La. C.C.P. art. 191; and La. C.C.P. art. 1631(A)).

The Louisiana Supreme Court ultimately employed a balancing test to determine whether the court records should have been sealed. Under the balancing test, motions to seal are left to the trial court's discretion and the burden of proof is placed on the party seeking concealment. The test balances "the parties' privacy interests against the public's constitutional rights of access to court proceedings

and documents." *Copeland II*, 2007–0177 at p. 10, 966 So.2d at 1047. The Court explained:

> Because Louisiana law provides a constitutional right of access to public records and a constitutional open courts provision, and because there is no statutory law exempting divorce records and proceedings from this right of access, a balancing test must be employed. Thus, in this case, we framed the balancing test to be undertaken by the trial court in analyzing the competing constitutional rights as follows:

> Considering the strong constitutional bias in favor of open access by the public to court proceedings, we find the trial court's blanket order sealing the entire record in this case to be overbroad. Although there may be some justification for sealing certain sensitive evidence in a proceeding, the parties have the burden of making a specific showing that their privacy interests outweigh the public's constitutional right of access to the record. The trial court, should it grant such relief, must ensure that its order is narrowly tailored to cause the least interference possible with the right of public access.

*Id*. (citing *Copeland I*, 2006-1023, p. 2, 930 So.2d at 941).

As a result, the *Copeland II* Court found that the trial court order sealing six of seven substantive pleadings was not narrowly tailored and overly broad. It further found that redaction, rather than sealing, would adequately protect the children and ordered that the name of the children's school and the location of the family home be redacted from the record. *Id*. at p. 12, 966 So.2d at 1048.

Charles contends that the trial court's alleged blanket procedure of sealing *Watermeier* testimony does not comply with *Copeland II*. Charles argues that when transcripts are sealed from access litigants have no way of knowing what was said to the trial court in-chambers and thus prohibiting them from making objections. Charles notes that this is particularly salient where the litigant was not represented by an attorney (and thus no attorney to hear the in-chambers testimony) and when the trial court allegedly made several legal errors.

However, Charles admits in her brief that "a transcript of the child's

testimony was made available to undersigned counsel by the Clerk of this Court." Charles also references portions of the sealed transcript in her brief and asserts several challenges to the hearing and the trial court's questioning of L.J. Charles thus had the opportunity defend against the testimony presented at the *Watermeier* hearing and bring any errors on the part of the trial court to this Court's attention on appeal. Because Charles did have access to the sealed hearing transcript she is not prejudiced by the trial court's ruling. There is also no evidence that the trial court sealed L.J's testimony as a matter of routine procedure. Furthermore, the trial court only sealed the portion of the transcript containing L.J.'s in-chambers interview, it did not seal the entire transcript and thus narrowly tailored the information to be sealed. Additionally, while the parties in this litigation have an interest in the court records, there does not appear to be a discernable public interest in the content of L.J.'s sealed testimony. Therefore, in applying the balancing test of *Copeland II*, it would appear that that maintaining the confidentiality of L.J.'s testimony outweighs the right of public access to the transcript. As such, the trial court did not abuse its discretion in sealing the *Watermeier* transcript.

### Notice and Due Process

Finally, Charles argues that she received insufficient notice of the rule to show cause for the hearing on the protective order and was deprived due process at trial.

Charles argues that under La. R.S. 46:2135(B) she was entitled to "notice of the temporary restraining order and the hearing on the rule to show cause by service of process as required by law within twenty-four hours of the issuance of the order." Charles notes while formal citation is not required for summary

27

proceedings, a "copy of the contradictory motion, rule to show cause, or other pleading filed by the plaintiff in the proceeding, and of any order of court assigning the date and hour of the trial thereof, shall be served upon the defendant." *See* La. C.C.P art. 2594.

The Louisiana Civil Code authorizes service by sheriff or special process server upon a motion of a party when service cannot made. *See* La. C.C.P. art. 1291 (providing that "[e]xcept as otherwise provided by law, service shall be made by the sheriff of the parish where service is to be made or of the parish where the action is pending"); La. C.C.P. art. 1293(A) (stating "[w]hen the sheriff has not made service within ten days … on motion of a party the court shall appoint a person over the age of majority, not a party and residing within the state whom the court deems qualified to perform the duties required, to make service of process in the same manner as is required of sheriffs").

Charles claims that service was not made against her by the sheriff nor by the appointment of a special process server and that the NOPD was not authorized to make service. Charles argues that requesting the NOPD to serve a photocopy of the protective order failed to comply with the formalities of proper legal service of process. Charles thus contends that the judgment on the protective order is an absolute nullity under La. C.C.P. art. 2002.

La. C.C.P. art. 2002 provides for annulment of judgment for vices of form and provides, in relevant part:

> A. A final judgment shall be annulled if it is rendered:
> * * *
> (2) Against a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction[.]

28

La. C.C.P. art. 2002(A)(2). Absolute nullities set forth in La. C.C.P. art. 2002 may be asserted at any time, in a collateral proceeding, and before any court. *Champagne and Rodgers Realty Co., Inc. v. Guillot*, 06-237, p. 10 (La. App. 5 Cir. 11/14/06), 947 So.2d 39, 45.

However, the comments to La. C.C.P. art. 2002 provide that this article "covers judgments rendered in cases where there was no citation at all, cases involving defective citation, and cases where the *defendant did not effect a waiver of service and citation by making a general appearance*." to La. C.C.P. art. 2002, cmt. (d) (emphasis added). Also, the proper method for contesting the sufficiency of service of process is by filing a declinatory exception. La. C.C.P. art. 925(A)(2). A party who fails to file an exception of insufficient service and appears waives the right to object to improper service. *In Re Medical Review Panel for Claim of Brunet,* 578 So.2d 1011, 1013 (La. App. 4 Cir. 1991); La. C.C.P. art. 925(C). Here, Charles appeared for the hearing on the protective order and testified. At no point during the hearing did she object to the improper service of process. Accordingly, Charles waived her right to challenge the sufficiency of service and is precluded from raising it on appeal. *See State v. Ramos*, 18-136, p. 4, n. 5 (La. App. 5 Cir. 12/27/18), 264 So.3d 564, 567 (noting that the father waived any objection to insufficiency of service of process of a petition to establish paternity and child support, and thus could not claim that the subsequent contempt judgment was absolute nullity, where record established that father appeared and testified at hearing, at no point did he object to the service of process, and he failed to plead

the declinatory exception of insufficiency of citation or service of process prior to trial).[18]

Charles also contends that even if a copy of protective order served by the NOPD was sufficient to put her on notice of the hearing, the notice was not given at a reasonable time and was thus denied due process.

La. R.S. 46:2136(B)(2) provides that a protective order may be rendered under the Domestic Abuse Assistance statutes if "[r]easonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process."

Charles alleges that she received a copy of the rule to show cause after 3:35 p.m. on January 1, 2019 and the hearing was set at 8:30 a.m. on January 3, 2019. Charles argues that January 1, 2019 was a legal holiday and thus is not included in the computation of time. *See* La. C.C. P. art. 5059(B) (stating a "legal holiday is to be included in the computation of a period of time allowed or prescribed, except when: * * * (3) The period is less than seven days"). Charles thus maintains that she obtained notice of the hearing less than thirty-two hours before the hearing, which cannot be considered "reasonable notice."

However, this Court and the Louisiana Supreme Court have recognized that by requiring the party seeking a protective order to file a petition specifying the allegations of abuse, the legislature has ensured that a defendant's constitutional due process rights, particularly the right of reasonable notice, will be observed.

---

[18] *See also First Tower Loan, LLC v. Taylor,* 2016-718, p. 4 (La. App. 3 Cir. 2/1/17), 211 So.3d 462, 465 (the defendant waived any objection to service of process by failing to file declinatory exception prior to or contemporaneously with general appearance on the record); *Reed v. St. Charles Gen. Hosp.,* 2008-0430, p. 22 (La. App. 4 Cir. 5/6/09), 11 So.3d 1138, 1153 (the Patient's Compensation Fund's appearance at a hearing constituted a waiver of its objection of improper service).

*Branstetter v. Purohit*, 2006-1435, p. 5 (La. App. 4 Cir. 5/2/07), 958 So.2d 740, 743; *Bays v. Bays*, 2000-1727, p. 6 (La. 2/21/01), 779 So.2d 754, 758.

In the present case, the petition alleged that Charles harassed, stalked, harmed/threatened to harm, intimidated, and emotionally and physically abused L.J. The petition also provided the details of the abuse and harassment that were discussed at trial, including the allegation that Charles made threats against L.J., pushed L.J. into a chair and forcefully cut her braids, that Charles had kicked L.J.'s scooter, pushed her underwater, and threw sand in L.J.'s face. Charles thus had reasonable notice that she was subject to a protective order and the allegations against her. Charles also appeared and had the opportunity to testify at the hearing. *See Rodriguez*, 2016-0610, p. 8, 207 So.3d at 496 (finding that the husband had sufficient notice of the wife's claims even though she did not specify that the abuse was life threatening when the petition described allegations of verbal and physical abuse and alleged that the wife was scared of the husband); *but see Darby v. Duplechain*, 2016-2, p. 2 (La. App. 3 Cir. 5/4/16), 192 So.3d 258, 259 (ex-boyfriend's due process rights were violated when the court entered a protective order against him, where there was no evidence that he had an opportunity to be heard before the protective order was issued against him).[19]

Charles further argues she was denied procedural due process because the trial court proceeded immediately to trial without giving her any opportunity to

---

[19] In *Darby*, 2016-2, 192 So.3d 258, after the parties appeared before the hearing officer, the hearing officer recommended that a protective order be issued against the ex-boyfriend and in favor of the ex-girlfriend and her two children. The ex-boyfriend sought a hearing to contest the recommendation. After an in-chambers conference with the trial court, the ex-boyfriend orally moved for a continuance, which was denied. He then requested that the matter be heard, which the trial court also denied. Nevertheless, the trial court adopted the recommendation of the hearing officer and issued the protective order. The Third Circuit reversed, finding that the ex-boyfriend's due process rights were violated, as he was not given a meaningful opportunity to be heard. *Darby*, 2016-2, p. 2, 192 So.3d at 259. The Court then remanded the matter for hearing.

urge pre-trial motions, to seek counsel, to prepare a defense, or to cross-examine the opposing party. Charles notes that at the outset of the hearing, the trial court immediately began eliciting testimony from Patterson about the facts of the case. The trial court did not ask if the parties were prepared to proceed, confirm proof of service, or if they needed time to obtain representation. Charles also claims that the trial court failed to allow her to cross-examine Patterson because after Patterson testified the trial court "simply" asked Charles "how do you want to respond?" Charles also argues that she produced a letter, which allegedly demonstrated that the DCFS determined that the abuse allegations were not "accepted." The trial court instructed Charles to hand the letter to her law clerk; however, it was not apparently filed into the record.

Procedural due process safeguards a person's Constitutional rights and requires that a person be given a meaningful opportunity to be heard. *Bays,* 2000-1727, p. 4, 779 So.2d at 758.

The trial court has vast discretion in determining how proceedings are to be conducted. *Rodriguez,* 2016-0610, p. 15, 207 So.3d at 499 (citing *D.M.S. v. I.D.S.,* 2014-0364, p. 17 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1138). This Court stated:

> A trial judge has discretion in conducting a trial. A judge is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. La. C.C.P. art. 1631. The judge's discretion includes the presentation of witnesses, La. C.C.P. art. 1632, as well as the admissibility of a witness's testimony. La. C.C.P. art. 1631. The trial judge has great discretion in the manner in which the proceedings are conducted before the court, and it is only upon a showing of a gross abuse of discretion that appellate courts have intervened. *Cooper v. Lacorte*, 99–1726, p. 3 (La. App. 4 Cir. 5/17/00), 775 So.2d 4, 7.

*Id.* (quoting *D.M.S.*, 2014-0364, p. 17, 225 So.3d at 1138).

Further, this Court has recognized that while *pro se* litigants should generally be given wide latitude, as they are at a disadvantage having no formal training in the law and rules of procedure; a *pro se* litigant also assumes responsibility for his lack of knowledge of the law, and must carry his burden of proof to be entitled to relief. *Succession of Gilbert,* 2016-0609, p. 3 (La. App. 4 Cir. 11/8/17), *writ denied,* 2017-2181 (La. 4/6/18), 240 So.3d 184, *reconsideration denied,* 2017-2181 (La. 6/1/18), 243 So.3d 1065, *and writ not considered, 2019-0050 (La. 2/25/19), 266 So.3d 291* (citing *In Re: Medical Review Panel Claim of Scott,* 2016–0145, pp. 14–15 (La. App. 4 Cir. 12/14/16), 206 So.3d 1049, 1058).

In the instant case, Charles appeared, testified, and was addressed by the trial court and thus had the chance to raise any issues in the proceedings, including, any pre-trial concerns, her lack of representation, her ability to cross-examine Patterson, etc., but failed to do so. She also did not lodge any objections at the trial on the protective order. Charles therefore was given a meaningful opportunity to be heard. Furthermore, both Charles and Patterson were unrepresented by counsel and thus neither party had more of an advantage at trial. As such, the trial court did not abuse its great discretion in the manner in which it conducted the hearing.

With regard to the DCFS letter offered by Charles, any error on part of the law clerk or the trial court in failing to place the letter into the record was harmless.[20] The record reflects that both parties referenced letters by the DCFS,

---

[20] The transcript provides, in part:

> THE COURT: You mentioned something from DCFS —
>
> MS. PATTERSON: I have the letter from DCFS.
>
> MS. CHARLES: I have it because — this report was made on October 16th by Ms. Patterson. I was out of town at a conference October 16th, no where [sic] in

one, which purportedly demonstrated that the allegations against Charles met the definition of child abuse and another, which allegedly showed that allegations of abuse were not accepted. However, neither is contained in the record. Moreover, given the testimony provided by Patterson and L.J., Charles' DCFS letter would not alter the outcome of the case.

Charles also takes issue with the trial court's refusal to consider evidence from a custody case allegedly pending in the 24th Judicial District Court. At the hearing, Charles stated she had a "contempt of court letter for her [Patterson] that this [sic] is the dates that the child [L.J.] has been gone." Charles contends in her brief that this contempt order shows the dates that Patterson withheld custody from L.J.'s father. The trial court, however, declined the evidence, stating "contempt is not before me." *Id*.

The trial court has vast discretion in its evidentiary ruling and will not be disturbed on appeal absent a clear abuse of that discretion. *Yokum v. Funky 544 Rhythm & Blues Cafe,* 2016-1142, p. 22 (La. App. 4 Cir. 5/23/18), 248 So.3d 723,

---

the city and I also have his contempt of court letter for her that this is the dates that the child has been gone.

THE COURT: Okay. Contempt is not before me. As far as the letter, is it saying that the events occurred while you were out of town? Is that just the date the report was made?

MS. CHARLES: The date that the report was made and nothing was —

THE COURT: Okay. You can give that to my law clerk.

MS. PATTERSON: And the problem that we were having with our first statement is she does work for DCFS so they said that they had to make this second statement confidential because something happened to the first statement.

MS. CHARLES: I can give you the information for the first statement that shows where it wasn't accepted.

Patterson's DCFS letter which she cited to support her allegations earlier in the transcript was also confusingly dated October 16, 2018.

740; *Ibieta v. Star Casino, Inc*., 1998-0314, p. 5 (La. App. 4 Cir. 10/7/98), 720 So.2d 143, 146; *see also Ariatti v. Plaisance*, 18-84, p. 15 (La. App. 5 Cir. 9/13/18), 255 So.3d 1239, 1250. Considering that the trial on the protective order concerned allegations of stalking and abuse against Charles and did not concern the custody dispute between Patterson and L.J.'s husband, it does not appear that the trial court abused its discretion in refusing to admit the contempt letter from the custody case. Charles' arguments regarding lack of notice and due process lack merit.[21]

## CONCLUSION

For the above stated reasons, the January 3, 2019 judgment is amended to show that the order of protection is issued pursuant to "La. R.S. 46:2171 *et seq.* (Non-intimate stalking)," and, as amended, the judgment is affirmed. We remand to the trial court for the limited purpose of correcting the Uniform Abuse Prevention Order in accordance with our ruling herein.

**AMENDED, AND AS AMENDED, JUDGMENT AFFIRMED; REMANDED WITH INSTRUCTIONS**

---

[21] Charles also claims that the trial court erroneously gave weight to the fact that the L.J.'s father had left the hearing early due to work commitments. The trial court noted it found that the fact that L.J.'s father had left the hearing in light of the allegations of abused against his daughter was "disturbing." However, there is no indication that the trial court relied upon the father's absence to grant the protective order. Also, as discussed herein, the testimony of Patterson and L.J. show that more likely than not Charles engaged in harassing behavior towards L.J., sufficient to establish a protective order for stalking.